JOHN H. MILBURN AND ELIZABETH MILBURN,
HIS WIFE,

*vs.*

FRANK G. MICHEL.

*Husband and Wife—Agency—Equitable Estoppel—Title to*
*Real Property.*

Evidence that, when it was suggested that the wife, as well as the husband, sign a contract for the sale of their property, the husband said that her signature was unnecessary because the property belonged to him, in which view the purchaser acquiesced, shows that the husband did not sign as the wife's agent.

p. 420

That a married woman, who was under the mistaken impression that property belonged to her husband alone, failed to disclose her own title, at the time of the execution by her husband of a contract for the sale of the property, does not estop her from thereafter asserting her title as against the purchaser.

pp. 421, 422

The doctrine of equitable estoppel is not applicable with respect to the title to real property, if the person claiming to have been misled was in a position, by reference to the public records, to learn the true state of the title.

p. 423

*Decided January 11th, 1921.*

Appeal from the Circuit Court for Baltimore County, in Equity (DUNCAN, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, and ADKINS, JJ.

*Arthur L. Jackson* and *Elmer J. Cook,* for the appellants.

*Linwood L. Clark,* for the appellee.

THOMAS, J., delivered the opinion of the court.

The bill of complaint in this case was filed for specific performance of an alleged contract of sale of a parcel of land, containing about five acres, and improvements, in Baltimore County, Maryland.

John H. Milburn, one of the appellants, purchased the land in 1907 for $2,600 and paid for it out of savings from his salary as a draftsman of the Baltimore and Ohio Railroad Company, by whom he had been employed since 1884. He directed his attorney to prepare the deed for the property, which is dated May 27th, 1907, so as to protect his wife in case of his death, and the deed was made to him and Lizzie A. Milburn, his wife, "as tenants by entireties," and duly recorded among the land records of Baltimore County. Some months later, for the purpose of erecting a dwelling on the land, he borrowed from the Real Estate Improvement Company of Baltimore City $2,000, secured by a mortgage of the property, executed by himself and his wife and duly recorded, and since then he and his wife and their family have occupied the property as their home. Two or three years before the date of the alleged contract of sale, in view of the condition of his wife's health, and prompted by a desire to secure a home or to live where she would have more diversion, he determined to sell the property, and to that end posted on the property a sign that it was for sale. His wife was not in sympathy with his plans, and was very much opposed to selling their home. She had never seen the deed for the property, and all that she knew about the title was Mr. Milburn's statement to her at the time he purchased the property that he had had it conveyed so that in case of his death she would be protected. He had not seen the deed or had it in his possession since the date of the mortgage in 1907, and while he had directed it to be prepared so as to protect his wife in case of his death he had never examined it. According to their positive testimony both he and his wife believed that he had the right to dispose of the property

in his lifetime, and acting upon that belief, and with the view we have stated, he persisted in his purpose to sell it, notwithstanding her equally determined opposition to a sale.

On March 1st, 1919, Frank G. Michel, the appellee, and his wife, went to look at the appellants' property and were shown through the house by Mr. Milburn. The following day, Sunday, the appellee and his father went to see Mr. Milburn at his home, and, according to his statement, Mr. Milburn told him that he wanted to sell the property and that if he wanted to talk business he could see him some time the next day. Mr. Milburn says that on Saturday evening, when the appellee and his wife were at his house, the appellee wanted to know if he would take $6,500 for the property, and that he told him he would take $7,500, and that when he came on Sunday with his father he tried to convince him, Mr. Milburn, that the property was not worth more than $6,500 but said he would give him $6,700; that he told the appellee that it was Sunday, and that he could see him the next day at his, Mr. Milburn's, office. They met on the following day and after much haggling over the price they finally agreed on $6,800, and as the appellee was a traveling man and had to go away on a trip, they parted with the understanding that the appellee would come to Mr. Milburn's house that night and close the matter. The appellee, his wife, and their three children, went to Mr. Milburn's house that night, and after they arrived Mr. Milburn and the appellee went upstairs, leaving Mrs. Milburn, her daughter, son-in-law, and grandchildren, and Mrs. Michel and her children down stairs. After Mr. Milburn and the appellee had been upstairs about a half hour, and after they had agreed upon the terms of settlement, Mr. Milburn went to the top of the stairway and called down to Mrs. Milburn to bring Mrs. Michel upstairs. She replied that she did not know why he wanted her to come upstairs, that she had nothing to do with the sale of the property, that he was selling it, but he insisted and she and Mrs. Michel went upstairs to where Mr. Milburn

and the appellee were.  Mr. Milburn prepared a memoran-
dum, which "was interlined and written over very much,"
and as he had been suffering with his eyes and had been for-
bidden to use them at night, he asked the appellee if he would
copy it.  The appellee was nervous, and said he could not
write, he was shaking too much, and Mr. Milburn then asked
Mrs. Milburn to make the copy.  Mr. Milburn, according to
his and Mrs. Milburn's testimony, asked her if she under-
stood it and she said that she did, and made two copies of it
but, according to the testimony of the appellee, Mr. Milburn
asked Mrs. Milburn "if she was satisfied and thoroughly
understood it" and she said "yes," while the appellee's wife
states that Mr. Milburn read the agreement over to Mrs. Mil-
burn and asked her "if it was satisfactory to her," and that
she said, "Why, yes.  It is fine."  After the two copies were
made and had been signed by Mr. Milburn, the appellee, ac-
cording to his testimony and the testimony of his wife, said
to Mrs. Milburn: "Mrs. Milburn, you better sign that, too,"
but that Mr. Milburn spoke up and said: "That isn't neces-
sary.  It is my property."  The appellee states that he did
not know at the time that it was necessary for Mrs. Milburn
to sign the agreement, and that as Mr. Milburn told him it
was his property, and he had the greatest respect for him, he
did not insist upon it.  Both Mr. and Mrs. Milburn positively
deny that anything was said about her signing the agree-
ment, and she says that if she had been asked to sign it she
would have positively refused to do so, as she was bitterly
opposed to the sale of the property; that if she had thought
that her signature was necessary, or that she could have
stopped the sale, she would have done so that night, but that
both she and Mr. Milburn thought at that time that he had
the right to dispose of it without her consent, and that it was
not until several weeks later, when Mr. Milburn took his copy
of the agreement to his counsel in order that he might look
after the insurance and the preparation of the mortgage to
be given by the appellee, that he learned that her consent was

necessary for the sale of the property, and informed her of it when he came home. She further testified that she remembered Mr. Milburn having to borrow some money, but that she had no recollection of having signed a mortgage in 1907, and that if she did she did it at his request and without reading, examining or understanding it.

A careful examination of all the evidence leaves no doubt in the mind of the court that Mrs. Milburn was bitterly opposed to the sale of the property, and that she was entirely ignorant of her right to interpose any objection; that Mr. Milburn and the appellee, in making the contract of sale, acted upon the assumption and belief that Mr. Milburn had the right to dispose of the property without Mrs. Milburn's consent, and that she shared in that belief until she and her husband were advised otherwise by counsel several weeks later.

The contract in question is as follows:

"Baltimore County, Md., March 3, 1919.

"Received from Mr. F. G. Michel one thousand dollars ($1,000) in part payment on my place on Windsor Mill Road, Woodlawn; a further payment of twenty-three hundred dollars is to be made when property is transferred, and balance of thirty-five hundred to be covered by a mortgage bearing an interest rate of $5\frac{1}{2}$ per cent. for a term of three years or less, or when the purchaser is able to pay. Interest to be paid semi-annually.

"J. H. Milburn.
"Frank G. Michel."

Counsel for the appellants notified counsel for the appellee that Mr. Milburn was willing to execute a deed for the property in accordance with the agreement, or to return to the appellee the $1,000 which he had paid, with interest thereon, but that Mrs. Milburn would refuse to sign the deed. After several letters from his counsel to Mr. and Mrs. Milburn, the appellee brought this suit to compel them to convey the property to him.

The theory upon which the bill was filed was that in sign-ing the agreement Mr. Milburn acted for himself and as the authorized agent of Mrs. Milburn. That theory is precluded, however, by the testimony of the appellee himself, supported by the testimony of his wife, to the effect that, when he sug-gested to Mrs. Milburn to sign the agreement, Mr. Milburn asserted that her signature was not necessary, because the property belonged to him, and that the appellee acquiesced in that view. This evidence not only shows that Mr. Milburn did not pretend to act as the agent of his wife, but it shows, on the contrary, that both he and the appellee acted upon the assumption that her participation in the agreement was not necessary.

The ground relied on by the appellee in this Court in sup-port of his bill and the decree of the court below is that Mrs. Milburn is estopped by her conduct from refusing to execute a deed to the appellee. Mrs. Milburn, however, did nothing to induce, encourage or promote the sale, or to mislead the appellee. The only thing she did was to copy the agreement, at their request, or the request of Mr. Milburn, and because of their infirmities, which could not, under the circumstances of this case, be regarded as a misrepresentation by her. Un-less, therefore, her mere silence or failure to disclose her title to the property can operate as a complete bar to her defense of that title, there is no principle upon which the appellee's claim can rest.

It is said in *Funk* v. *Newcomer,* 10 Md. 301, quoting from *Hall* v. *Fisher,* 9 Barb. (N. Y.) 17: "If a person maintain silence, when in conscience he ought to speak, equity will debar him from speaking when conscience requires him to be silent." In *Carmine* v. *Bowen,* 104 Md. 204, CHIEF JUDGE McSHERRY, after quoting the above statement, says: "Silence is a species of conduct and constitutes an implied representation of the existence of the state of facts in ques-tion, and the estoppel is accordingly a species of estoppel by misrepresentation. * * * When the silence is of such a char-

acter and under such circumstances that it would become a fraud upon the other party to permit the party who has kept silent to deny what his silence has induced the other to believe and act upon it, it will operate as an estoppel." In 11 *Am. & Eng. Ency. of Law,* 427, it is said: "Estoppel may arise from silence as well as words; but this is only where there is a duty to speak, and the party upon whom the duty rests has an opportunity to speak, and, knowing the circumstances requiring him to speak, keeps silent. * * * It is not necessary that the duty to speak in such cases should arise out of any agreement or rest upon any legal obligation in the ordinary sense; it arises whenever the principle of natural justice requires the disclosure." This is the rule, and these are the authorities upon which the appellee relies, but a consideration of the meaning and purpose of the rule to prevent fraud or injustice shows that it can have no application to the facts of this case. Here Mrs. Milburn did not know of her title to the property. All she knew was that Mr. Milburn had told her that she would be protected in case of his death, and both she and the appellee relied upon the assertion by Mr. Milburn that the property belonged to him and that he could dispose of it without her consent. How could she "in conscience" be expected to speak of what she did not know, and upon what principle of "natural justice" could she be required to disclose facts of which she had no knowledge? The obligation to speak rests upon knowledge of the undisclosed facts, and silence can operate as an estoppel only where there is knowledge and concealment of those facts. There are cases to the effect that equity will not require specific performance of a contract into which a party has been induced to enter by reason of the misrepresentations of the other party, even though such misrepresentations were innocently made. *Ginther* v. *Townsend,* 114 Md. 122. But we know of no case holding that *silence alone* operates to estop a party from denying the existence of a contract, and authorizes a court of equity to require him to execute a deed,

where the party estopped had no knowledge of the facts claimed to have been concealed. In the case of *Lammot* v. *Bowly,* 6 H. & J. 524, the court says, "that a party is not bound by his silence, unless he has a knowledge of his right, and fraudulently conceals it where he ought to speak." The same statement of the law is made in *Cumb. C. & I. Co.* v. *Sherman,* 20 Md. 152. In 10 *R. C. L.* 693, the author says: "But to effect an estoppel by silence it must also appear that the person had a full knowledge of the facts and of his rights, that he had an intent to mislead, or at least a willingness that others should be deceived, and that the other party was misled by his attitude," and in 16 *Cyc.* 759, it is said: "To make the silence of a party operate as an estoppel the circumstances must have been such as to render it his duty to speak. It is essential that he should have had knowledge of the facts, and that the adverse party should have been ignorant of the truth, and have been misled into doing that which he would not have done but for such silence." Without deeming it necessary in this case to adopt all the requirements of the text in 10 *R. C. L., supra,* it is clear that where silence alone is relied on, a party cannot be required to surrender his property upon the doctrine of estoppel, unless he had knowledge of the facts claimed to have been concealed. A careful reading of the cases of *Storrs* v. *Baker,* 6 John. Ch. (N. Y.) 166; *Diffenderfer* v. *Knoche,* 118 Md. 189; and *Ginther* v. *Townsend, supra,* cited and relied on by the appellee, will show that they do not support a contrary view.

But there is a further reason why the appellee is not entitled to the relief prayed in this case. In *Park Association* v. *Shartzer,* 83 Md. 13, JUDGE BRISCOE, speaking for the court, said: "Upon the question of equitable estoppel, relied upon by the plaintiff, we need only say, that it was essential for its application with respect to the title of real property that the party claiming to have been influenced by the conduct or declarations of another to his injury was himself not only destitute of knowledge of the true state of the title, but

also of any convenient and available means of acquiring such knowledge. Where the condition of the title is known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel." See also *Frazee* v. *Frazee,* 79 Md. 27, and *Sullens* v. *Finney,* 123 Md. 658. The same rule is stated in 16 *Cyc.* 738-741, and 10 *R. C. L.* 692-694, and supported by the numerous cases cited in the notes. On page 741 of 16 *Cyc.* it is said: "But when the foundation of the estoppel insisted upon is the silence and omission to give notice of one's rights, the party relying upon the same must not have had the means of ascertaining the true state of the title by reference to the public records," and that "there can be no equitable estoppel short of one arising from actual contract where the truth is known to both parties or where both parties have equal means of knowledge." In the case at bar the deed of the appellants was duly recorded among the land records of Baltimore County, and was equally accessible to the appellee and Mrs. Milburn. Having elected to rely upon Mr. Milburn's statement that the property belonged to him, instead of resorting to the public records for information in regard to the title, he cannot now obtain the relief desired upon the ground that he was misled by the silence of Mrs. Milburn.

The record shows, and Mr. Milburn states in his answer, that he offered through his counsel to return to the appellee the amount he paid on account of the price mentioned in the agreement, and it follows from what has been said that the decree of the court below should be reversed, and the bill dismissed, without prejudice to such remedy as the appellee may have at law. *Miller's Equity Procedure,* Sec. 677; *Busey* v. *McCurley,* 61 Md. 436; *Schwanebeck* v. *Smith,* 77 Md. 314.

> *Decree reversed and bill dismissed with costs,
> without prejudice to such remedy as the
> plaintiff may pursue at law.*