# SOPHIA STERN

*vs.*

# ISAAC SHAPIRO.

*Specific Performance—Sale of Land—Time as Essence— Authority of Attorney—Evidence.*

In respect to the character of proof required to establish a contract sought to be specifically enforced, it is plaintiff's duty to make out the case set up in the bill with such distinctness, certainty and legality in all its parts that the court may have no difficulty in deciding exactly what the contract was. The proof must be clear and explicit, leaving no room for reasonable doubt, and must in every essential particular correspond with the terms of the contract set up in the bill. p. 625

Time is not to be deemed to be of the essence of a contract unless it is expressly stipulated in it, or is to be inferred from its nature or the circumstances of the case. p. 626

A written memorandum of a contract for the sale of land, acknowledging the receipt of a deposit, and reciting that the sale is "to be concluded within thirty days of deposit, otherwise the deposit to be forfeited," shows that time was of the essence of the contract, especially when taken in connection with undisputed evidence that at the time of delivering the contract the vendor's daughter told the purchaser that unless it was settled in thirty days he would not get the property, and that the vendor had reasons for restricting the time for settlement. p. 627

An attorney at law, employed in that capacity to examine a contract of sale and to protect the vendor's interests therein, has no authority, by virtue of his employment and his profession, to vary the contract by extending the time for its performance. p. 628

In a proceeding for specific performance of a contract of sale of which time was of the essence, *held* that plaintiff purchaser's

delay in performance was not the result of statements made by the vendor's attorney and her daughter, so as to estop the vendor from asserting such delay.　　　　　p. 629

*Decided June 27th, 1921.*

Appeal from the Circuit Court of Baltimore City (STANTON, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, URNER, STOCKBRIDGE, and OFFUTT, JJ.

*Benjamin Rosenheim* and *Randolph Barton, Jr.,* for the appellant.

*Edward J. Colgan, Jr.,* and *Israel S. Gomborov,* for the appellee.

OFFUTT, J., delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of Baltimore City ordering Mrs. Sophia Stern, the appellant, to specifically perform a contract for the sale of a house identified as 1039 North Eutaw Street, Baltimore, to Isaac Shapiro, the appellee, for $3,200.

At the time the contract was made Mrs. Stern lived in the house with two of her daughters, and was then and for some time had been in bad health. For that and other reasons she was herself rather averse to selling it, but was persuaded by her daughter Marie, who disliked the neighborhood, to agree to dispose of it.

Under these circumstances Isaac Shapiro made an offer to buy it for $3,200, which offer the appellant accepted, and the terms and conditions of the sale were embodied in the following written memorandum of sale signed by the parties:

"Balto., 4/11/18. Rec'd of Mr. Isaac Shapiro the sum of twenty-five dollars deposit on house 1039 N. Eutaw—in fee simple, sale to be concluded within 30

days of deposit, otherwise the deposit to be forfeited
by Mr. I. Schapiro.  Mrs. Sophia Stern is to be given
one month time to remain in the house after settlement
free of rent (her apt.).  Mrs. Sophia Stern, Sophia
Stern.  Sale price of house, $3,200.00.  $3,200.00 net,
no fees.  Marie Stern.  Isaac Shapiro."

This contract was written by Marie Stern, who was present
and took an active part in the interview at which the contract
was signed and executed by Mrs. Stern at her home on
April 4th, 1918.  The next day Miss Marie Stern took the
contract to Mr. John M. Requardt, a member of the Balti-
more City Bar and asked him to represent Mrs. Stern's inter-
ests under it.  Testifying as to what took place on that occa-
sion, she said: "Yes, I gave him the contract that Mr.
Requardt reminded me the other day that I made the re-
mark to him that I did not see how Mr. Shapiro is going to
pay for the house and he said that he had thirty days' time
in which to pay for it.  Two days after that Mr. Shapiro
came in and I told him the deed was at Mr. Requardt's office,
and when I was up at Mr. Requardt's office I said, 'How
about mother?  You know mother cannot come here.  She is
not allowed to go anywhere.  How will it do about the sign-
ing of the deed?'  He said, 'I will tell you what, Miss Marie,
when it comes up I will notify you and we will send the deed
down, with the notary public to your house for your mother
to sign.'  He said, 'yes.'  Mr. Requardt always did.  I said,
'All right, let me know.'  He said, 'All right, let notify us
beforehand.' "  At or about the same time Mr. Shapiro re-
ferred his interest in the contract to Mr. Israel S. Gomborov,
his attorney.  On May 21, 1918, after the time fixed in the
contract for its performance had expired, Mr. Gomborov de-
livered to Mr. Requardt a check for the balance of the pur-
chase money due on the house, which Mr. Requardt accepted,
and at the same time gave Mr. Gomborov a letter to Mrs.
Stern in which he explained the amount of the check and re-
quested Mrs. Stern to execute a deed for the property.  This

she refused to do on the ground that as the property had not been paid for within the time limited by the contract, the contract was under its terms at an end. The vendee, however, claimed that he had been ready before the expiration of the time limited in the contract to perform its terms but that he had been misled by Miss Marie Stern, the vendor's agent, and by the vendor's attorney, into believing that it was not convenient to the vendor to close the transaction until the time it actually was consummated by the delivery of a check to the vendor's attorney, and he further insisted that in accepting the check Mr. Requardt was acting as the vendor's agent, and that in consequence she is estopped by his action from refusing to specifically perform the contract. But in reply to these contentions, the vendor asserts that while Mr. Requardt was her attorney to see that the contract was performed, he was not her agent authorized to vary it, and that as his acceptance of the check for the balance of the purchase money was after the time for performance of the contract had expired, he had not the authority to change its terms by extending the time for its performance, and that his act in doing so was, in the absence of her assent thereto, not binding upon her; and she also denied that the vendee was misled into believing that she had ever agreed to any modification of the terms of the agreement as to time within which it was to be performed.

The evidence in regard to these divergent theories is vague and conflicting and its purport can be best stated by quoting briefly from the testimony of the several witnesses.

Isaac Shapiro, the appellee, testified that he saw Miss Stern twice after the execution of the contract of sale. The first occasion, he said, was about five days after the date of the contract, when he called at her home to obtain the deed under which her mother acquired the property, and she then told him that Mr. John M. Requardt, their attorney, had the deed; that about two weeks later he again saw her at her home and he then asked her when would be a suitable day to settle the property and she told him: "Everything is left with Mr. Requardt. Whenever he will send for us, because my mother

might be sick, and whenever he sends for us we will sign the deed. Mr. Requardt is entrusted to receive the money. We trust everything to Mr. Requardt." The witness continuing said he informed his attorney of this conversation and that he had said, "That is all right, I can get along with Mr. Requardt, I have had a number of conversations with him and we always get along nicely," and that he then left the matter with Mr. Gomborov and Mr. Requardt. He further said that on the occasions refered to he dealt with the daughter because "she was always representing the business affairs," and he did not see Mrs. Stern at all after the contract was signed. The witness further testified: "I left it to Mr. Gomborov and Mr. John Requardt to arrange the time of settlement. I was ready with the mortgage. Mr. Gomborov was ready with the insurance, and everything was ready, and when the time came there was set a day of settlement to settle the property. Mr. Gomborov handed over the check to Mr. Requardt. Mr. Requardt wrote a letter to Mrs. Stern and sent over a notary public direct to their house, stating the fact that everything is settled and please to sign the deed to the property, and have it acknowledged before the notary public." (The "day of settlement" referred to by the witness appears to have been the 21st day of May.) The witness further said that he was "ready within ten or twelve days" after he purchased the property, and was able at any time to pay for it. On cross-examination he testified that he was continually importuned by Mrs. Stern and her daughter to sell the property for them, and that Mrs. Stern had spoken to him about it only a day or so before the contract was signed. When asked if he had not telephoned to the Sterns to inquire if they wanted to sell the house, he replied: "I did not telephone, I did not have to because she told me personally before that time if I could get her a purchaser she would sell it," but later on when asked the same question he said: "I don't remember telephoning. If I did, maybe I did, but I don't remember it." He further said that he had gone to Mr. Requardt's office for the deed about "two days after signing

this contract," and that he had arranged with a building and loan association to advance money on the property. He was then asked, "Will you say 'that you or Mr. Gomborov, or somebody on your behalf offered to pay Mrs. Stern the purchase money for this property within the time specified in that contract, namely one month," to which he answered: "When I came there it was about one week before, about ten days before the settlement," I said, "Our building association is ready when you are ready?" They said, "whenever Requardt arranges the hour, the time." It was, however, admitted that the tender was not made within the time specified. He was then asked how often he had seen Mrs. Stern after the execution of the contract, and at first said, "only once, I came three days after asking for the deed and then she referred me to Mr. Requardt." He was then asked: "And that was the only time you saw Mrs. Stern after the contract," and he answered, "twice I seen her. Another time was two weeks later, to ask her when they will be ready." He amended this statement by saying that these interviews were not with Mrs. Stern at all, but with her daughter Marie, and explained the fact that he dealt with the daughter instead of the mother by saying: "When I saw Mrs. Stern in other instances she referred me to her daughter, that she does her business."

Mr. Israel S. Gomborov, the appellee's attorney, testified that Shapiro had asked him to search the title to the property, but he did not recall just when that request was made. When asked about that he said: "I do not know the date. I simply judge from the fact that I ordered the lien sheet and the lien sheet is dated April 20th, 1919, 1039 North Eutaw Street, so I presume that I must have started the examination of that title, or I was ordered to start the examination of that title before the 20th of April." And when asked how he came to meet Mr. Requardt in connection with the transaction he said: "I really do not recall that except that I got the deed to the property and it came to me, and it was evidently prepared in Mr. Requardt's office, because it has

his cover on it. I started to examine the title and as is customary with me—I never complete a title and check the title off until it comes down to actual settlement. I examined the title and the first thing I find among my communications— my memory is very hazy, but for some reason or other that settlement did not take place according to the terms of the contract, on the 11th of May, because I find among my communications that on the 13th of May I communicated with Mr. Requardt. Why, I do not know, that I could not find a release of a mortgage, and I have only my copy of that letter. * * * In that letter I said, 'I understand that this property is to be settled this coming Wednesday, May 15th, 1918, at noon at my office, and I will thank you if you will let me know if the same is satisfactory to you.' Why it was ordered to be on May 15th at my office, I do not remember. I find on May 15th I ordered a judgment sheet." The witness then produced a letter from Mr. Requardt to him dated May 16th, 1918, in which the writer said: "Mrs. Stern is so ill that it is practically impossible to have her come down town. Won't you send the deed for the property to be transferred, and I shall have it executed and hold it at my office until you are ready to settle the matter." The witness then identified a letter from Mr. Requardt to Mrs. Stern in which he informed her that he had received a check for the property and requested her to execute the deed. This letter which was dated May 21st, 1918, was sent with the deed by a notary public to Mrs. Stern. When asked whether the letter of May 15th was the first communication he had had with Mr. Requardt in reference to the transaction, Mr. Gomborov said: "No, sir; this surely was not the first, and my memory is rather very hazy on that, but I do not find anything or any response of his to, as to my communication of the 13th. However, I do know that I passed the title from the fact that I was ready to make a settlement, and therefore there must have been a telephone communication between Mr. Requardt and myself." The witness further testified that he had gotten the check back from Mr. Requardt. On cross-examination, when asked

when he finished the examination of the title, he said: "I have tried to explain to you that I never check off a title, if I possibly can help, until practically the last day. I do not remember why I have not—I do not know of any reason why I have not the notice of a prior settlement, or a prior date for settlement, but I did receive a notice from somebody, somehow, which I do not recall, that there would be a settlement on the 15th day of May, and I must have received that—do you want me to give you the balance of my answer?" And after saying that he did not recall ever having seen the contract, he was asked this question: "But you say you think the time of settlement was fixed as the 15th of May?" and he replied: "No, sir; I did not say that. Somebody must have given me notice that the time was the 15th. Now whether Mr. Requardt or Mr. Shapiro gave me the notice I do not know. I infer that, from a copy of my letter, where I wrote to him and said I understood it was the 15th of May."

Testifying on the appellant's behalf Miss Marie Stern said that Mr. Shapiro had called up her home by telephone on the night of April 10th and said that he had heard Mrs. Stern wanted to sell her house, and when informed that they did he inquired what they wanted for it. Witness told him she would not discuss that matter over the telephone, but told him if he would come to her home, she would talk it over with him. That he did go to her home that night and there met Mrs. Stern and the witness. In describing that interview she said: "Mr. Shapiro came in and we were talking, and he asked the price, he said to mother, do you want to sell the house? To tell the truth, mother did not want to sell the house, but I did on account of the neighborhood. I just gave her the wink and she was sort of in a condition that she did not care what I was doing. There was something about price and then I said. 'Come around tomorrow night. It is too much for mother tonight.' The next night he came around and I had talked mother into it during the day time and Mr. Shapiro came around, it must have been between eight

and nine o'clock * * * so finally we came to an agreement and I said 'Listen here Mr. Shapiro, I have heard about you. Remember this is to be settled in thirty days, and if it isn't settled in thirty days you do not get the house.' He turns around and remarks to me, 'I can settle it at any time.' I said then it is up to you it must be settled within thirty days."

The witness continuing her testimony, said that she took the contract to Mr. Requardt, who had known the family for some time, and left it with him. That when she was there she said to him: "How about mother, you know mother can't come here. She is not allowed to go anywhere. How will it do about the signing of the deed," and that he said, "I will tell you what, Miss Marie, when it comes up I will notify you, and we will send the deed down with the notary public to your house for your mother to sign * * * and that she said, "All right, let me know." The witness further said that about two days after that, Shapiro came to her home and asked about the deed, and she told him it was at Mr. Requardt's office; that she did not see him after that until after her mother had refused to sign the deed on the 21st of May; that on the evening of that day he called and asked why Mrs. Stern had refused to sell the house; that he was very angry and abusive, and told her that he did not want the house but he would make them "spend a lot of money." The witness further said that she had never had any authority from her mother to act as her agent, and that her mother was not present at any interview with Mr. Shapiro after the execution of the contract. On cross-examination the witness emphasized her statement that she had not seen Shapiro from the time he came to her home to ask about the deed a day or two after the contract was signed until the night of May 21st. She also said that neither she nor her mother had notified Mr. Requardt or Shapiro that the contract had "run out," and denied that they wanted to sell the property to any one else, but said that on the contrary her mother was averse to leaving it, because as her husband had died in it she wanted

to die in it. When asked when she had arranged with Mr. Requardt to notify her as to when the transaction was to be closed, she said: "The day I gave Mr. Requardt the contract, and within thirty days he was to call me up two or three days to let me know so I could come down to his office." When asked how Shapiro was to know when the day was to be "fixed for the deed to be signed" she answered that he "had his attorney," and in reply to another question said that he knew she "was ready at any time." She was then asked whether she had ever told Shapiro that she and her mother would be ready to sign the deed at any time they were notified by Mr. Requardt that the matter was ready for settlement, she answered, "Yes, within thirty days," and added that "that information was given on the night of the transaction."

After saying that she had had no communication with Mr. Requardt from the time she took the contract to him until May 21st, she was asked how Mr. Requardt knew on May 16th that her mother was too ill to sign the deed on the 15th, and replied that it was a "puzzle" to her, unless Mr. Requardt had taken the "responsibility on himself." That it was a fact that her mother had been sick for over a year and Mr. Requardt knew that the deed would have to be sent to her home to be executed, but that they had had no communication with him from time she had visited his office, the day after the contract was signed, until May 21st.

Mr. John M. Requardt, who acted as the attorney for Mrs. Stern in the transaction, said that Miss Marie Stern brought the contract to his office about the twelfth of April and asked him to pass on it, and that he had neither seen nor communicated with her or Mrs. Stern from that time until May 21st. He was then asked if there had been any communication between him and Mr. Gomborov regarding a settlement, and he said "I think I wrote him a letter urging him to make a settlement." After identifying the letters of May 16th and May 21st and testifying to having received a check in settlement of the purchase price for the property on May 21st, he said that on that night or the following morning Miss Marie Stern

called him over the telephone. He was then asked why he had said in his letter of May 16th that Mrs. Stern was too ill to come down to sign the deed and he replied: "I had known Mrs. Stern for many years and I knew she was very ill and that she did not come down town, and I had had several transactions with these folks where Mrs. Stern had not been able to appear at my office, for probably six months anterior to this time, and it was probably on that assumption that I said she could not come down. It was a matter of my own personal knowledge. I knew she was not coming down town and that all the business was transacted through her daughter." He further testified that he urged the purchaser to make the settlement, and went to the purchaser's office on the day of settlement, and consummated it according to what he understood was his employment. He was then asked: "Did she tell you to do that for them or not?" And he replied: "At the time she came to see me, evidently yes, or I would not have written the letter, but the question was asked me whether I had any authority to extend the time, and I answered, 'No, I did not know anything about the time, about the extension of the contract or anything about that,' I would not testify I had that express authority." The witness was shown the letter of May 13th from Mr. Gomborov, and while he failed to recall having received it, he did remember having an interview with him in reference to the title to the property, but he was not able to remember why in that letter Mr. Gomborov assumed that the property was to be settled for on May 15th, nor could he remember who had fixed May 15th for the settlement.

This concluded the testimony in the case except that Mr. Shapiro, called in rebuttal, denied that he had called at the Stern home on the evening of May 21st or that he had made the abusive statements to which Miss Stern testified.

In considering the weight and effect of this evidence in its relation to the issues made by the pleadings in this case, we are affected and indeed controlled by the rule that the complainant in such a case as this, to obtain the relief prayed,

must established by clear, certain and convincing proof, free from ambiguity or reasonable doubt, the allegations of the bill of complaint. In other words, "In respect to the character of proof required to establish a contract sought to be enforced, it is the duty of the plaintiff to make out the case set up in the bill with such distinctness, certainty and legality in all its parts that the court may have no difficulty in deciding exactly what the contract was. The proof must be clear and explicit, leaving no room for reasonable doubt, and must in every essential particular correspond with the terms of the contract set up in the bill." *Miller's Equity*, Sec. 676.

Measured by this standard we cannot say that the appellee has in this case met the burden placed upon him by this rule. In support of his bill of complaint he relied mainly upon these three propositions: first, that time was not of the essence of the contract, and that therefore, reasonable diligence was all that was required of him in the performance of its terms; second, that Mr. Requardt, by virtue of his employment and profession, had the authority to vary the contract by extending the time for its performance, and that the appellant is bound by his action in doing so; and third, that the appellant was misled by the conduct of Mr. Requardt, appellee's attorney and Miss Marie Stern, her agent, into delaying the performance of the contract until the time limited in it had expired, and these propositions we will now consider.

The general rule in equity is undoubtedly, as contended by the appellee, that time is not deemed to be of the essence of a contract unless it be expressly stipulated in it, or is to be inferred from its nature or the circumstances of the case. *Coleman* v. *Applegarth*, 68 Md. 21; *Wilson* v. *Herbert*, 76 Md. 499; *Jaeger* v. *Shea*, 130 Md. 1; *Miller's Equity*, Sec. 662. But on the other hand, where the parties to the contract by their express agreement make time of the essence of the contract, it will be so treated, and neither their reasons for doing so, nor the effect of the provisions upon their respective interests will be considered. *Miller's Equity*, Sec. 663; *Coleman* v. *Applegarth*, 68 Md. 21. Nor is it necessary that any

particular words or form or the phrase "of the essence" of the contract be used to make time of the essence of a contract, but it is sufficient if it clearly appears from all the text of the contract or from its character or the surrounding circumstances that the parties intended it to be so. "If the parties have \* \* \* expressly treated time as of the essence of the agreement, or if it necessarily follows from the nature and circumstances of the agreement that it should be so regarded, courts of equity will not lend their aid to specifically enforce the agreement, regardless of the limitation of time." *Coleman* v. *Applegarth,* 68 Md. 21; *Acme Bldg. Assoc.* v. *Mitchell,* 129 Md. 406; *Jaeger* v. *Shea,* 130 Md. 1.

Applying these principles to the facts before us there is no question that time was intended by the parties to be of the essence of the contract. The written memorandum of the contract, which was in the form of a receipt, contained this language: "Rec'd of Mr. Isaac Shapiro the sum of twenty-five dollars deposit on house 1039 N. Eutaw—in fee simple, sale to be concluded within thirty days of deposit, otherwise the deposit to be forfeited by Mr. I. Shapiro." Obviously, when the parties stipulated that the sale was to be "concluded within 30 days of deposit otherwise the deposit to be forfeited by Mr. I. Shapiro" they meant that unless concluded in that time the contract should be at an end. And this intention was emphasized by the testimony of Marie Stern, which is not directly disputed or denied, that at the time the contract was delivered the appellee was told "this is to be settled in thirty days and if it isn't settled in thirty days you do not get the house," and it is also supported by the concomitant circumstances. Mrs. Stern was ill and did not really wish to sell at all, and they were doubtful whether the appellee would be able to perform the contract, and they desired therefore to limit the time within which he would have any interest in the property. These facts bring the case directly within the decision in *Acme Bldg. Co.* v. *Mitchell,* 129 Md. 406, and what was said by the court in that case

through JUDGE URNER is equally applicable here. 13 *C. J.* 626-628.

The second proposition upon which the appellee relies is that Mr. Requardt, by virtue of his employment and his profession, was authorized to vary the contract by extending the time for its performance, and that therefore Mrs. Stern is bound by his action in doing that. Mr. Requardt was an attorney at law, he was employed in that capacity to examine the contract and safeguard her interests under it. He was not her general agent, nor was he specially authorized either directly or by implication to make a new contract or vary the old one, nor did the fact that he was an attorney at law *per se* enlarge the scope of his agency, under such circumstances, as to matters not connected with litigation. 6 *C. J.* 657. These principles are supported by the case of *Abrams v. Eckenrode,* 136 Md. 248, in which it is said: "The employment of an attorney to prepare the contract of sale, or to attend to its fulfillment, did not in itself invest the person engaged for such a service with real or implied authority to modify the agreement as to any of its terms."

Assuming for the reasons stated that Mr. Requardt had no authority to modify or change the contract of sale, and that the time within which it was to be performed was one of its essential elements, it follows that he had no authority to extend or enlarge that time, because to do that would be to change the contract.

This brings us to the third proposition, which is that the appellee was misled by the conduct of Mr. Requardt, the appellant's attorney, and Miss Marie Stern, her agent, into delaying the time for performing it until the time limited by its terms for performance had lapsed and that therefore the appellant is estopped from setting up such delay as a reason for not performing the contract. The principles of law involved in this proposition are generally recognized and may be regarded as settled, but the facts upon which the proposition is predicated are not in our opinion sufficiently supported by the testimony.

There were two witnesses on each side to the material facts, Mr. Shapiro and his attorney, Mr. Gomborov, for the appellee, and Miss Stern and Mr. Requardt, Mrs. Stern's attorney, for the appellant. It is conceded that no tender of the purchase money was made within the time limited by the contract. Why this was not done the testimony does not disclose. There is nothing to indicate that the delay was due to Mr. Requardt, nor is he connected with it at all except through a statement in his letter of May 16th, written several days after the contract had expired, in which he said Mrs. Stern was too ill to come down town and the deed would have to be sent to her to be executed, and this statement was based, not upon any immediate information, but upon his knowledge that Mrs. Stern had been an invalid for a long time. It does not appear that during the original term of the contract he said or did anything to induce the appellee to believe the time for performance fixed by the contract would be extended or that it could not be performed within that time.

Nor can the delay be attributed to Mr. Gomborov. He said he did not remember having seen the contract and it does not appear that he knew when it was to be performed. It does appear that in one of his letters he assumed the date of settlement was to be May 15th, 1919, but that assumption communicated to appellant's attorney after the time limited for the performance of the contract had passed could not bind the appellant, especially as he said he did not know how that date came to be selected or by whom.

The appellee however in effect contended that he was led by Miss Stern to believe that when Mrs. Stern was ready to settle, Mr. Requardt would notify him or his attorney, but his testimony in support of this contention is flatly contradicted by Miss Stern, who denied that the interview at which he said she told him this ever took place. Under such circumstances the facts alleged by the appellee cannot be said to have been established. Both witnesses were apparently of equal standing, both were to some extent interested, and neither was corroborated, nor was there any such inherent

*indicia* of verity in the appellee's testimony as entitled it to any greater weight then that of Miss Stern, nor is he aided by the surrounding facts and circumstances of the case. There is, it is true, an effort to supply the deficiencies in the evidence by conjectural and speculative testimony, but such testimony is without that probative force which is necessary to entitle it to consideration as a basis for the action of a court in determining the rights of litigants in controversies before them.

For the reasons stated above we are of the opinion that the appellee was not entitled to a specific performance of the contract which forms the basis of the bill of complaint in this case, and that the bill should have been dismissed. It follows therefore, that the decree appealed from must be reversed.

*Decree reversed with costs and bill dismissed.*