McGINNIS, ET AL. *v.* CHANCE

[No. 418, September Term, 1966.]

*Decided July 5, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, OPPENHEIMER, BARNES and FINAN, JJ.

*Charles C. W. Atwater,* with whom were *Mylander & At-
water, Thomas J. Doud, Jr.* and *William E. Dixon* on the brief,
for appellants.

*James L. Wray,* with whom were *Wray & Serio* on the brief,
for appellee.

FINAN, J., delivered the opinion of the Court.

The episodic maze of facts presented by this case defies economy of composition and necessitates the recounting of events in detail.

Arthur J. McGinnis, one of the appellants and a plaintiff below, obtained an option from John J. Rogers and wife, dated April 4, 1963, for a consideration of $200 to purchase the parcel of land here involved, located in Anne Arundel County, for the sum of $50,000. On May 3, 1963, McGinnis gave notice of his intention to exercise the option and shortly thereafter removed the timber from the property with the Rogerses' permission. He then tried to sell his interest in the option to a Mr. Hurd, but was unsuccessful because a title search revealed that there were certain apparent defects in the Rogerses' title because of the lack of compliance with certain statutory requirements when the property was sold to the Rogerses at a tax sale held on October 11, 1932.

After this information was given to the Rogerses, they entered into a new contract with the appellant, dated September 23, 1963, reciting the same consideration of $200 and other good and valuable considerations for a purchase price of $50,000. With reference to the date for settlement and its duration the contract contains the following provisions:

> "SETTLEMENT to be on or before ninety (90) days from the date that the Sellers are able to give such title as a title insurance company permitted to do business in the State of Maryland, will approve and insure in the amount of Fifty Thousand Dollars ($50,-000).
>
> "It is further agreed that the Sellers will join in any proceedings deemed necessary by the Buyers' attorney to rectify the defects in the title and to execute any pleadings, documents, etc., necessary for the Sellers to deliver a marketable title and insurable title by said title company.
>
> "Buyer will immediately proceed with due diligence to clear title to said property but in no event will the time of this contract exceed eighteen (18) months.
>
> * * *
>
> "BUT, in case such defects in the title are not rec-

tified and the Seller cannot deliver a marketable title, insurable by said title company, the Buyers shall have the option to declare this contract null and void; and, if so declared, the deposit of Two Hundred Dollars ($200.00) paid hereunder is to be returned to the Buyer."

On October 1, 1963, this contract was assigned by the appellant McGinnis to appellant Charles Dudley, plaintiff below, for a consideration of $10,000, of which $6,000 has been paid, the balance to be payable at settlement.

No proceedings were instituted in any court by or on behalf of the appellants to clear the title, but William E. Dixon, Esq., attorney for appellants (also brother-in-law of Mrs. Dudley and the president of The Monumental Title Company), on behalf of appellants, first employed Garrett Larrimore, Esq., to take action to clear title, and employed John P. O'Ferrall, Esq., to investigate the law with reference to the title of the Rogerses. Mr. O'Ferrall prepared and gave to Mr. Dixon an opinion as to the validity of the title of the Rogerses, concluding that the real question was whether the Rogerses had title by adverse possession, having been in possession and control of the property under a deed from the County Commissioners from 1940 to 1963. He concluded the tax sale was probably technically bad and noted that Ch. 182 of the Acts of the General Assembly of 1964 provided that all tax sales prior to 1944 in Anne Arundel County could not be subject to further attack after June 1, 1966. He recommended that tactically it would be well to postpone settlement until June 1, 1966, if possible, rather than file a bill to quiet title before that date. Dixon stated that he thought it best not to bring a suit for specific performance at that time because if no attack was made on the title before June 1, 1966, the Rogerses would have a good title by the Act and it was easier to sit back than to take affirmative action. However, Dixon and appellants all knew the terms of the contract called for final settlement within 18 months, which would have been March 23, 1965.

The appellee, Thomas E. Chance, defendant below, in the meantime had investigated the title to this parcel of land and

had obtained deeds from the heirs of William Queen who was the record owner at the time of the tax sale in 1932. The grantee in these deeds was Helen Clarke, an employee of the Chance family, and according to the stipulation filed in the proceedings, had no interest in the title. The appellee, at the time of his deposition, stated he was representing a third party as attorney and refused to name his client. An order of court was entered requiring him to name the real owner of the equitable title, and it has been stipulated that the client for whom appellee was acting was his father, Edward G. Chance, who subsequently conveyed all of his right, title and interest to the appellee.

On July 1, 1964, Helen L. Clarke, who, a stipulation shows, was acting as agent for appellee, filed a bill in equity in Anne Arundel County (No. 16,484 Equity) alleging, among other matters, that the tax sale of the property owned by William H. Queen was defective, and that she "owns a good and merchantable, fee simple title to the aforementioned real estate, having acquired title by deeds dated June 23, 1964, the grantors being all the heirs at law of William H. Queen." An answer in that case was filed by the Rogerses on September 2, 1964, denying the right of the plaintiffs to the relief sought. Depositions were taken, witnesses were summoned, exhibits filed and testimony taken. As a result of these proceedings, a decree of court was entered on October 19, 1964, in which the tax sale was set aside.

Mr. Raphael Urciolo, a member of the bar, in his deposition taken on November 11, 1965, testified that the first time he came in contact with Mr. Rogers was when the above case was in process, at which time Rogers was represented by his attorney, Mr. Gott. Mr. Urciolo also represented the Rogerses in an advisory capacity, and it was then that he saw the contract between the Rogerses and McGinnis dated September 23, 1963. He stated that an agreement was entered into between Clarke and the Rogerses to the effect that regardless of the outcome of the suit (*Clarke v. Rogers* (sic)) the property would be titled in the names of Clarke and the Rogerses—one-half interest in each —and that this agreement was reached "either prior or simultaneously" to the taking of testimony in that case. He stated that

he then advised the Rogerses to enter into an agreement whereby title would be transferred to the appellee and Joseph Urciolo (Raphael's brother), who would hold the title for the benefit of the Rogerses and Clarke. He knew that the title was bad and that the September 23, 1963 contract was about a year old, but since appellant McGinnis had done nothing to clear the title, which he was required to do promptly under the contract, he, Urciolo, considered the contract to be worthless. He felt that it would be more expeditious to hold the matter in abeyance until after March 23, 1965—the expiration of the eighteen months settlement date in the contract—than to go into court prior to that time to set aside the contract. Urciolo further testified that he made no effort to inform McGinnis of these transactions.

Early in January of 1965, Dixon, on behalf of the appellants, after receipt of the O'Ferrall memorandum, endeavored to contact Mr. Rogers. After numerous attempts he succeeded in making contact with him and was told by Rogers that Urciolo was acting as his attorney and he was the one with whom to speak. Rogers did not mention the proceedings in the case of *Clarke v. Rogers* (sic), nor his agreement with appellants and Urciolo to execute a deed to them on March 24, 1965. Dixon told Mr. Rogers at that time of O'Ferrall's memorandum, which recommended that the best way to perfect the Rogerses' title would be to take no action until after June 1, 1966. Appellant Dudley was ready and willing to settle by March 23, 1965, if the extension were not granted, but because of the O'Ferrall memorandum Dixon advised postponement if the Rogerses were willing to postpone.

Dixon made numerous attempts from early January to the first of March 1965 to contact Urciolo, attorney for the Rogerses. Urciolo admitted that he received many messages that Mr. Dixon had called, but returned none of the calls. On or about March 2, 1965, Dixon finally reached Urciolo on the telephone. He told Urciolo of the O'Ferrall memorandum in which it was recommended that the best way to perfect the Rogerses' title was to wait until June 1, 1966. Urciolo, in answer to the direct question: "What was your response to Mr. Dixon's request for an extension of time in order to perfect the title of Rogers?" said: "Well, send me a copy of the memorandum

[meaning O'Ferrall's report on the title] and I'll be in touch with you." Dixon, in response to the request of Urciolo, on March 3, 1965, wrote to Urciolo and sent him a copy of the memorandum. He said in his letter, "we would like to go through with this contract but would like to postpone it until after June 1, 1966 * * *."

When Dixon did not hear from Urciolo promptly, he again made efforts to contact him by telephone, but to no avail. Dixon, on March 29, 1965, again wrote to Urciolo stating that he had been unable to contact him and that he had again spoken to Mr. Rogers who informed him that he should work through Urciolo. Thereafter, when still unable to contact Urciolo and having received no reply to either letter, he recorded the contract of sale (between McGinnis and the Rogerses) on April 4, 1965. He made further efforts to contact Urciolo by telephone and wrote to him on April 22, 1965, informing him that the contract had been recorded and stating that he was interpreting the failure of Urciolo to contact him as an acquiescence to an extension of the agreement.

In the meantime, the Rogerses and Clarke executed a deed on March 24, 1965 (one day after the expiration date of the Rogerses' contract with appellant McGinnis), which was recorded March 29, 1965, whereby title was conveyed to appellee and Joseph Urciolo as joint tenants.

On June 11, 1965, Dixon learned from a surveyor, Hall, that some deed had been recorded conveying title to the Rogerses' property. A run-to-date of the Rogerses' title was made which disclosed not only the deed from the Rogerses and Clarke to appellee and Joseph Urciolo on March 24, 1965, but also disclosed the equity proceedings in July of 1964. Dixon contacted appellee and had a conference with him on June 15, 1965, and informed him that, in his opinion, the proceedings in the Circuit Court in the matter of *Clarke v. Rogers* (sic) were invalid. A bill of complaint was then prepared and filed on July 2, 1965 in the instant case.

Appellee and Joseph Urciolo, on May 26, 1965, sold the property to a combine composed of John V. Arban, Pascal Della Badia (two clients of Urciolo's) and Florence E. Urciolo (wife of Raphael Urciolo) for a consideration of $90,000. A purchase

money mortgage was executed back to appellee and Urciolo for $70,000. Raphael Urciolo testified at the time of his deposition that he had a title report which showed the outstanding recorded contract from the Rogerses to appellant McGinnis, but that he did not inform any of the members of the combine (for whom he was acting as attorney while also acting as trustee for the Rogerses as to their one-half interest) of the existence of this exception stated in the title report.

The learned chancellor granted summary judgment for the appellee finding time to be of the essence of the contract, and that even if it were not that the contract should have been performed within a reasonable time under the circumstances of the case, which the appellants failed to do, citing *Barnes v. Euster*, 240 Md. 603, 214 A. 2d 807 (1965) ; *Trotter v. Lewis*, 185 Md. 528, 45 A. 2d 329 (1946) ; *Stern v. Shapiro*, 138 Md. 615, 114 A. 587 (1921). With this conclusion we would agree, if consideration were to be given to only the literal wording of the contract. However, there are material facts outside the four corners of the instrument which we believe to be in dispute and which affect an equitable assessment of the whole transaction and which accordingly renders the application of summary judgment procedure inappropriate. Rule 610 d. See *Whitcomb v. Horman*, 244 Md. 431, 224 A. 2d 120 (1966) ; *Reeves v. Howar*, 244 Md. 83, 222 A. 2d 697 (1966). Compare *Owens v. Simon*, 245 Md. 404, 226 A. 2d 548 (1967), which reached an opposite result.

The facts contained in the depositions of the parties and their witnesses, in the exhibits filed in the case, and in the affidavit accompanying the answer to the motion for summary judgment, raise a genuine dispute as to whether or not the actions of the appellee and those acting with him to place the title out of reach of the appellants, might have been such as to have estopped the appellee and the Rogerses, and those acting on the Rogerses' behalf, from refusing to extend the time of settlement beyond March 23, 1965.

The contract for the purchase of the land was between McGinnis and the Rogerses. The Rogerses were eventually represented by Raphael Urciolo. As a general rule the actions of an attorney within the scope of his employment are binding on his client

under the ordinary principles of agency. *Bob Holding Corp. v. Normal Corp.*, 223 Md. 260, 164 A. 2d 457 (1960) ; 7 C.J.S. *Attorney and Client* § 79 (1937) and 7 Am. Jur. 2d *Attorneys at Law*, § 100 (1963).

As early as July 1, 1964, when the contract still had nine months to run, the Rogerses were made a party to a suit in equity (*Clarke v. Rogers* (sic)) which had as its purpose the declaring of the Rogerses' title a nullity. Such action was a direct attack on the subject matter of the then existing contract with the Rogerses. The deposition of Chance is unclear as to whether or not the Rogerses agreed to the initiation of the suit. The depositions of both appellee and Raphael Urciolo, however, are quite clear as to the agreement of the parties prior to the taking of the testimony in *Clarke v. Rogers* (sic) to the effect, that regardless of the outcome of the suit, appellee and the Rogerses, or their nominees, would each end up owning an undivided one-half interest in the property. Also, it is clear that at that time the suit of *Clarke v. Rogers* (sic) was in progress, Chance and Urciolo knew of the existence of some type of contract between the Rogerses and McGinnis affecting the subject property.

The proceedings in *Clarke v. Rogers* (sic) raises the vexing question that the Rogerses may have had a sound legal basis for sustaining their title to the subject property by adverse possession ; however, the agreement reached between appellee and Urciolo, acting for the Rogerses, may well have kept this suit from being a truly adversary proceeding. Testimony, if taken on this point regarding the agreement between the parties in *Clarke v. Rogers* (sic), might in the instant case have shed light on the extent of complicity of the Rogerses, Urciolo and appellee.

Although the Rogerses and Urciolo are not parties to this appeal, appellee being the only party below moving for the summary judgment, yet, if the facts raise the question of whether or not appellee with knowledge of the existence of the contract between the Rogerses and McGinnis, acted in concert with the Rogerses and Urciolo to defeat the contractual rights of McGinnis, then such facts as might spell out estoppel against the Rogerses and Urciolo give rise to the question of tortious in-

terference with the contractual rights of another on the part of appellee.

The facts relating to the actions of Urciolo and the appellee insofar as they impinge upon McGinnis' contract with the Rogerses, are susceptible to the inference of tortious interference. As was stated by Judge Parke, speaking for this Court, in *Goldman v. Building Assn.*, 150 Md. 677, 133 A. 843 (1926) at p. 681 :

> "A contract, it is true, can only impose its obligations upon those who are parties to it, but a duty rests upon third persons not to interfere, without lawful justification, with the due performance of obligations of the parties under the contract."

Cf. *Horn v. Seth*, 201 Md. 589, 95 A. 2d 312 (1953) and *Stannard v. McCool*, 198 Md. 609, 84 A. 2d 862 (1951).

The opinion of this Court is not to be construed in any manner as challenging the right of the appellee in his acquisition of title to the property from the heirs of Queen and his right to seek through legal processes the removal of any cloud on such title as he may have acquired. This he had a right to do. However, it is when we get into the area of the equity suit of *Clarke v. Rogers* (sic), in which action the appellant McGinnis was not joined and concerning which he had no notice, that the Court becomes troubled.

From the depositions it is not at all clear as to whether McGinnis was, or was not, a necessary party to *Clarke v. Rogers* (sic). The court hearing that case adopted the master's opinion that McGinnis was no more than an optionee and although he would have been a proper party, he was not a necessary party. On the contrary, the depositions filed in the instant proceedings as well as exhibit No. 2, the agreement of May 2, 1963, wherein McGinnis gave notice of his intention to exercise his option, raise the qeustion as to whether or not he was more than an optionee, having possibly acquired an equitable interest.

Also, we become concerned when we proceed beyond the ambit of appellee's efforts to perfect the title he obtained from Queen, and assess his efforts to defeat McGinnis' contract with the Rogerses. Assuming *arguendo* that as a result of the suit of

*Clarke v. Rogers* (sic), appellee's title was established as the valid one, there should have been little else to concern him. Yet, he was sufficiently concerned as to induce the Rogerses to join into an agreement whereby his nominee and the Rogerses' nominee would each become vested with an undivided one-half interest in the property.

The record likewise reveals that Raphael Urciolo acting for the Rogerses and knowing of the agreement he had made with appellee on behalf of the Rogerses possibly misled Dixon, as Dixon contended, in the exchange of conversation he had with him in early March 1965, prior to the expiration date of March 23, 1965, when in reply to Dixon's recitation of the flaws found in the Rogerses' title, said: "Well, send me a copy of the memorandum [O'Ferrall's title report] and I'll be in touch with you." Urciolo subsequently not only failed to get in touch with Dixon but he avoided further contacts. Although the learned chancellor did not place such a connotation on Urciolo's statement, as it appeared in the depositions, yet, we think that it was a matter upon which further testimony might well have been developed at a hearing.

The chancellor in his opinion stated:

"At most, Urciolo's failure to contact Dixon, who is an experienced real estate operator, showed a refusal to discuss the granting of the extension of almost fourteen months as requested. In fact, Urciolo's whole actions indicated to anyone of reasonable prudence that such an extension would be refused. Silence cannot be construed as to be consent unless the party has a duty to speak, which duty rests upon knowledge of an undisclosed fact or where one has full knowledge of his rights but he had an intent to mislead or deceive and the other party is misled by his attitude. *Milburn vs. Michel,* 137 Md. 415."

In the instant case Urciolo knew of the contract between his clients and McGinnis, the equity suit of *Clarke v. Rogers* (sic), and the agreement between his clients and appellee, whereby the nominees of the Rogerses and appellee were shortly to record a deed vesting each with an undivided one-half interest in

the property. In *Milburn v. Michel*, 137 Md. 415, 112 A. 581 (1921), this Court found that a wife was not estopped from claiming an outstanding title in herself merely because of her presence when her husband asserted his right to contract for the property free of his wife's signature. In that case the Court found that both parties had equal means of knowledge and both parties were equally without knowledge. In the instant case Urciolo had full knowledge of all the facts of the rather devious transaction. Dixon and the appellants had none. To be sure a more recent run-to-date of the title would have revealed the equity suit of *Clarke v. Rogers* (sic); however, the appellants had previously, in good time and good faith, had a competent title search made at which time the equity suit had not been filed. This Court in *Milburn, supra,* quoting from 11 *Am. & Eng. Ency. of Law,* 427, stated at p. 421:

> "It is not necessary that the duty to speak in such cases should arise out of any agreement or rest upon any legal obligation in the ordinary sense; it arises whenever the principle of natural justice requires the disclosure."

Cf. *Bean v. Stewart Petroleum*, 244 Md. 459, 224 A. 2d 295 (1966).

In *Machovec v. Shipley*, 171 Md. 339, 189 A. 223 (1937), the appellees purchased the stock and fixtures of a lunchroom from the appellants. At the time of the sale the appellees stated that they would not purchase the business unless they could obtain a lease and one was executed for a five-year period with extension provisions. At the time of the execution of the lease, the appellant's father owned a life interest in the property and the appellant was the remainderman. The record title also showed the appellant as remainderman. However, at the time of the negotiations for the lease the question was asked if the appellant's father was the sole owner to which the appellee replied in the affirmative. Later, after the appellant's father died, she endeavored to increase the rent provided for in the lease; and upon the appellee's refusal to pay the increased rent, filed an ejectment suit. This Court, in affirming the lower court's verdict for the appellees, quoted from *Knouff v. Thompson*, 16 Pa. 357, 364 (1852), stating at p. 345:

"The party who has placed his written title on record has given the notice which every person is bound to know and respect. The law does not require him to go further. But if he speaks or acts, it must be consistent with his record title."

In the instant case, Urciolo's reply to Dixon's anxiety about the flaws in the Rogerses title was less than frank. Urciolo told him to send him the attorney's memorandum on it and he would get in touch with him. Yet, he knew at that time that a court of equity had declared his clients' title null and void. In addition he knew that his clients had consummated an agreement whereby they would retain an undivided one-half interest in the property; the whole title to which ultimately became vested in Urciolo's wife and two other clients.

Had Urciolo, the Rogerses' attorney, disclosed the true status of the title to the property to Dixon, attorney for the appellants, it may well have been that the appellants would have elected to consummate the transaction with the Rogerses and rely on the Rogerses claim of title by adverse possession. In any event there was too much in dispute here to be put to rest by summary judgment.

We are of the opinion that when the chancellor granted the appellee's motion for summary judgment, the posture of the case was such as to reveal that a genuine dispute existed as to material facts as outlined in this opinion, and, accordingly, the case must be reversed and remanded for further proceedings.

> *Order reversed and remanded for further proceedings consistent with this opinion, appellee to pay the costs.*