WEINREICH, Adm'x of the Estate of William Henry Jamison *v.* WALKER

[No. 15, September Term, 1964.]

*Decided October 15, 1964.*

The cause was argued before HENDERSON, C. J., and HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

*James G. Perry* and *Martin Moncarz* for appellant.

*Richard H. Lerch,* with whom were *Lerch & Huesman* on the brief, for appellee.

HAMMOND, J., delivered the majority opinion of the Court. HORNEY, J., dissents. Dissenting opinion at p. 302, *infra.*

For the appellant, the plaintiff below, to prevail we must find that Judge Carter erred in striking an enrolled judgment in a tort case, on the ground that there had not been valid service of process on the defendant. If he did err, the appellee, the defendant below, and his insurance carrier must pay the judgment; if his action was proper, the appellant will lose her judgment and have only a claim.

On April 9, 1962, William Jamison was crossing the street at an intersection in Baltimore when he was struck by an automobile driven by Robert Walker, the appellee. Jamison died soon after the accident, as a result thereof, and his daughter, the appellant, was appointed administratrix of his estate. She employed a lawyer to recover damages for her father's expenses and suffering resulting from the accident. Walker was insured with the Southern General Insurance Company which had issued to him its policy under the financial responsibility provisions of the law—Code (1957 and 1964 Cum. Supp.), Art. 66½, Sec. 131 (a) (6) (F): "* * * the liability of the insurance carrier shall become absolute whenever loss or damage included in such policy occurs * * *," and had filed with the Department of Motor Vehicles an S. R. 22 form certifying that such insurance was in effect to cover Walker.[1]

The claimant's lawyer told Walker that he represented the

---

1. National Indemnity Co. v. Simmons, 230 Md. 234, and Barrella v. Stewart, 228 Md. 378, make it plain that where there is S. R. 22 insurance in force, the insurer is liable whether or not it had notice of the suit and an opportunity to defend, as well as that other defenses, such as non-cooperation by the insured, are not in such circumstances available to the insurer.

claimant and ascertained from him the identity of his insurance company. The lawyer notified the adjuster for the insurance company that he represented the claimant and there followed various letters and telephone calls between them. No offer of settlement was made, and the appellant filed suit against Walker on November 7, 1962. Walker had changed his residence shortly before that date and the sheriff did not effect service, twice filing a return of non-est.

Md. Rule 116 a 1 provides that the court may in its discretion, for good cause, appoint an adult to execute "* * * any process other than writs of execution, replevin or attachment of property or person," as well as that "the person appointed shall have the same power and duty to execute such process as a sheriff." Sub-paragraph e says that "any person served with process pursuant to this Rule shall be required to comply with such process to the same extent as if it had been served by the sheriff."

The plaintiff below procured an order of court appointing Robert E. Ammons, a member of the Bar of Maryland and an insurance investigator, to execute the service of summons on Walker. Twelve days later, on January 30, 1963, Ammons found Walker at the parking lot in Baltimore where he worked and left with him the summons, declaration, interrogatories and request for admission of facts. Pursuant to Rule 116 c Ammons filed with the clerk of court his affidavit, setting out that he had served Walker at a specified place and time, in a manner described. Ammons had no other connection with the case or interest in it except that he knew one of the claimant's lawyers through their mutual activities in church work.

Walker immediately called his insurance agency to tell them of the papers left with him, although he says he thought they were unimportant records of the accident. When he called, he was told the agency was very busy but to bring the papers in to them when he next came in to make a payment. When he went some two weeks later to make a payment he did not bring the papers because "they had slipped his mind" but he "talked with the manager about it" (he did not disclose the manager's reply or reaction).

Walker did not plead to the suit and judgment by default

was taken against him on February 20, 1963. Inquisition was held March 26, and the damages were set at $10,000.

On April 29, the claimant's lawyers, anticipating, they say, that an attack would be made by the insurance company on the validity of service on Walker, sent one Bass, a law student and insurance investigator, to check with Walker. He took a statement which Walker signed, saying in part that suit papers had been served on him on January 30, 1963, that he had not yet turned them over to the insurance company but that he had been told to do so by "the man who served them on me," and that he did on January 30, the day they were left with him, call the insurance company and "tell them about the suit papers."

Walker mailed the papers to his insurance agent Daly on April 29, the day he gave the statement, and the next day the Southern General Insurance Company filed a motion to strike the judgment, alleging that it was the real party in interest, that the claimant knew she did not have a meritorious claim and knew that judgment could not have been obtained "unless it was obtained surreptitiously and while settlement negotiations were pending," and that the judgment was obtained "by means of fraud, mistake and irregularity."

On May 9 Walker filed a motion to strike, alleging obtention of the judgment by "fraud, mistake and irregularity," in that he "was not apprised, in any substantial form, that service was intended to be made upon him but, on the contrary, * * * was informed and apprised that the documents handed to him were unimportant papers concerning the accident * * *."

Judge Carter held a full hearing at which he went into the merits of the tort claim and allowed counsel for Walker and his insurer wide latitude (including almost complete invasion of the file over appellant's lawyers' objection that it was their "work product") in their effort to show a conspiracy on the part of claimant's two lawyers, and Ammons and Bass, deliberately and studiedly to obtain a judgment against Walker without allowing him or his insurer to know of it. At the conclusion of the hearing, Judge Carter announced that he had found no Maryland decision in point, but that based on out of state cases he believed the law to be that service is not valid when "a delivery of process is so masked by words or conduct

of the process server that the defendant is not apprised of the fact that service is intended to be made upon him." He said that to him Walker was a reliable witness and that he accepted his versions "as to the events of January 30, 1963, and those of April 29, 1963," and found, "as a fact not only that Walker was not apprised of the fact that service was intended to be made upon him but also that he was misled into believing that the declaration, summons, etc. constituted some unimportant record of the accident in question." Judge Carter concluded therefore that there had been mistake in obtention of the judgment because valid service had never been acquired, and struck the judgment as void.

We think the findings and conclusions of the court and its action in striking the judgment cannot stand. It is firmly established that a court will not set aside an enrolled judgment unless the proof of the existence of one or more of the grounds permitting such action is clear and convincing. *Harvey v. Slacum,* 181 Md. 206. It is equally well established that a proper official return of service is presumed to be true and accurate until the presumption is overcome by proof and the mere denial of personal service by him who was summoned will not avail to defeat the sworn return of the official process server. *Little v. Miller,* 220 Md. 309, 315, and cases cited. Chief Judge Bond for the Court in *Parker v. Berryman,* 174 Md. 356, 359, adopted the language of *Windwart v. Allen,* 13 Md. 196, 200: " 'Intendments will be made in support of the acts of ministerial officers, where they appear by the return of process to have discharged their duty, and the *onus probandi* rests on the party impeaching such acts.' " *Sarlouis v. Firemen's Ins. Co.,* 45 Md. 241, 244, held that the affirmative testimony of the official process server acting in the regular routine of duty without a motive to misrepresent must be preferred to the negative evidence of one claiming not to have been served "from public policy as well as upon the rules of probability." Judge Urner, for the Court, put it in this wise, in *Weisman v. Davitz,* 174 Md. 447, 451, after first restating the rules just referred to: "If the defendant's denial is not supported by corrobative testimony or circumstances, or the evidence offered by him is refuted by opposing proof, the attempted impeachment of the official return must fail."

It is true that there may be successful impeachment of service seemingly valid on the record but, in all the Maryland cases in which there has been, the circumstances have ranged from virtual demonstration of the lack of service (as in *German v. Slade,* 42 Md. 510, in which a defendant swore he had not been served and the deputy sheriff swore he had served the other defendants but not that one and had entered the notation of service by mistake) to clear and convincing evidence that there had not been service, in the form of corroboration of the defendant's claim that there had not been, by independent disinterested witnesses, plus lack of refutation, when challenged, by the sheriff or others. See, for example, *Master v. Master,* 223 Md. 618 (the defendant wife swore she was working in Washington when she was said to have been summoned and was corroborated by her employer's payroll records and check) ; *Little v. Miller, supra* (the defendant, a seaman, swore he was on a voyage when he was said to have been served and official Coast Guard records supported him) ; *Harvey v. Slacum, supra* (husband and wife swore they had never been summoned and the deputy sheriff did not know whether he had served the father or his son, could not recognize the husband in the courtroom and could not remember the wife or say that he had summoned her) ; *Plummer v. Rosenthal,* 178 Md. 149 (sworn denial by Earl Rosenthal of any service; sheriff identified the brother of the defendant, Irvin, as the man he had summoned) ; *Piedmont-Mt. Airy Guano Co. v. Merritt,* 154 Md. 226 (father said to have been served at home of his son; sworn denial of service plus corroboration that the father never at any time was at son's home at the hour mentioned by the sheriff; summons for both father and son were found by son's wife on his bureau and sheriff was highly uncertain in attempted identification) ; *Pattison v. Hughes,* 80 Md. 559 (four witnesses swore sheriff was completely drunk when he called and said only "I want you to come to Ellicott City"; sheriff did not deny it).

In the case before us, Ammons, who for the purpose of serving the appellee and the attendant consequences, had the status of a sheriff, testified clearly and explicitly under oath that he had inquired of people in Walker's former neighborhood as to his whereabouts and had found out about the parking lot at which

he worked, that he walked into the office of the parking lot and asked for Walker, who identified himself, that he asked his date of birth and the number of his driver's license and found they agreed with those in his notes, that he then told Walker the sheriff ordinarily would have come but he, Ammons, had been appointed by the Superior Court to serve him in the place of the sheriff with the summons, the declaration, the interrogatories and the admission of facts, and opened an envelope in which they were and spread the papers out in front of Walker, with the summons on top, and explained they were suit papers, named the plaintiff's lawyer—who was known to Walker—and said that is what he claims and this is how much he is claiming, told Walker he would have to answer the questions asked and his insurance company would provide a lawyer to help him answer, and that he must turn the papers over to his insurance company right away.

Ammons says the reason he explained what the declaration said and claimed with unusual care was because Walker gave the impression that he thought he was free of any liability for the accident because he had been acquitted in Traffic Court. He said to Ammons: "I thought that thing was all over. Are they still kicking it around?" Ammons said Walker telephoned his insurance agent while he was there and reported he had been told he would have to call back later to talk to the man he wanted. Ammons left the papers with Walker.

Walker corroborated Ammons in a number of respects. He is literate, having gone through the fifth grade at school and through an additional four "levels" in the Army. He was at his desk in the parking lot office, working on records of oil and gasoline when Ammons walked in. His insurance company adjuster noted in his records that Walker was of average intelligence and was worried about the accident. Ammons told Walker he had been looking all over the place for him, that he had come to see him in the place of the sheriff of Baltimore to serve him with some papers about his accident. Walker then said: "And he ripped the envelope open and spread them out and ruffled them open so I could take a look * * *." Walker said he glanced at the papers but never noticed what they were. (It is difficult to believe that even a glance at the heavy black

type of the summons would not reveal that it was a command to answer in the Superior Court.) He said Ammons told him he could turn the papers over to his insurance company "if he wanted to" and because of that phrase he got the impression the papers were unimportant; he thought his Traffic Court acquittal ended his worries about the accident. He put the papers back into the envelope and then in a drawer and then in his car, and they slipped his mind.

We think Walker's testimony amounts to no more than an unsupported, uncorroborated denial of effective service which cannot stand in the face of the sworn return of Ammons, pursuant to Rule 116, and his positive and clear testimony that Walker was served, corroborated as they are to a substantial extent by Walker himself, both on the stand and in his statement to Bass (which was in evidence), and in his two efforts to tell his insurer of the service of the papers.

If Walker is right in his recollection that Ammons told him he could turn the papers over to his insurance company "if he wanted to," this would not invalidate the service and would not be enough to justify Walker in disregarding the papers when they were shown to him, or later when he could have looked at them at his leisure. What Ammons did was no masking of service, even on Walker's version of what occurred.[2] The situ-

---

2. The rule urged by the appellee, concerning a masking of service by words or conduct of the process server, which Judge Carter adopted, apparently originated in Bulkley v. Bulkley, 6 Abb. Prac. 307 (an early New York case). In that case the summons was inclosed in a small, closed box which was sealed and wrapped. This was delivered to the defendant by the process server as she was about to leave on a boat embarking for California. The defendant was told by the process server, when the box was handed to her, that it contained a present for her mother and a note for herself. The defendant did not open the box until she was at sea and beyond the jurisdiction of the court. The default judgment obtained by the plaintiff was vacated by the court. Similarly, In Re Bonesteel's Will, 228 N. Y. S. 2d 301 (1962), cited by Judge Carter, in which the masking of service is spoken of, is clearly distinguishable. There, service was attempted on an eighty-three-year old, senile, invalided woman by laying an envelope containing the process papers on her nightstand, addressed to her son, the process server being unable to make his mission understood to the woman. The

ation is not unlike that in *Parker v. Berryman, supra.* There the constable testified he found Mrs. Parker at her farm and read the summons to her, but had no copy to leave. Mrs. Parker told him, he said, she would not come, she was no more responsible than others for the bill (a funeral bill). Mrs. Parker agreed the constable did visit her but she saw no paper and does not remember what he said and she thought he was trying to collect a bill. A daughter-in-law who was present did not hear the conversation but saw nothing to indicate a paper was read. Chief Judge Bond for the Court said at page 359 of 174 Md. that Mrs. Parker's denial that the summons was read would not avail her and the probabilities supported the return.

> "It would seem highly probable that the constable, having gone so far as to visit the house for the purpose, would not then fail to carry out the single piece of business which had brought him. * * * Having been served, and the proceedings thus started forward, her failure of comprehension, and her resting upon a protest to the constable, could not, in any forum, be considered as a ground of attack on the judgment."

Walker's lawyers, who also represent the insurance company, urge that his testimony amounted to more than a mere denial of effective service because of the testimony they adduced in an effort to show a plot on the part of appellant's lawyers to build a claim they knew to be completely worthless into a $10,000 collectible judgment by serving Walker in such a way that he would not know he was being served, and thereafter concealing the suit and the service until the time for appeal from the judgment by default had passed. There are fatal flaws in the hypothesis that such a plot existed. It requires a finding that only absolute necessity would compel, a finding that three members of the bar—appellant's two lawyers and Ammons—and a law student all conspired to engage in and did engage in unethical, unworthy, dishonest and criminal practices and that all thereafter committed perjury to insure collection of the fruits

---

court thought the service clearly ineffectual, primarily because the facts suggested that the suit papers were being left for someone else, viz. her son, and therefore vacated the judgment.

of their undertaking. It is undisputed that efforts were made to serve Walker in the customary way, through the offices of the sheriff, and service by Ammons was resorted to only because the sheriff failed. Appellee's lawyers themselves proved that although the appellant's lawyers knew Walker was insured almost immediately after the accident, they did not know until after judgment had been taken that the insurance was of the S. R. 22 variety, in which the defenses of failure of the insured to forward suit papers or otherwise cooperate are not available to the insurer to defeat liability. In addition, Ammons testified he did not know of the S. R. 22 insurance until just before the hearing on the motion to strike. If the insurance had been of the common or garden liability variety, as appellant's lawyers and process server thought, the last thing they would have wanted was not to have had Walker properly served or to have him fail to notify his insurer and thus vitiate his coverage, because a judgment against him apparently and, in all likelihood would have been uncollectible in the absence of insurance coverage.

In the file of appellant's lawyers was a notation that several weeks after suit was filed, that is about December 1, 1962, the adjuster for the insurance company covering Walker had been told over the telephone that suit had been filed. The adjuster denied hearing of the suit but testified that his file on the Walker case had been entirely inactive from December 1962 to April 1963 because he had been ill, the employee to whom it had been given had left and a new employee, an alcoholic, lasted only two weeks, and he was unable to obtain a new adjuster for some time. In addition to this testimony of notice to the insurer of suit, there is Walker's testimony that he told the insurance agent of the papers served on him soon after he was served, and within two weeks talked to the manager of the agency about them.

That the appellee's characterization of the appellant's claim as completely worthless is an overstatement would seem to follow from the adjuster's testimony that the insurance company took him to task in November 1962 for being dilatory in closing the case and the testimony of the man employed by the adjuster in March or April of 1963, who said he was given the

Walker file with instructions to reach a "friendly settlement."

Undoubtedly the appellant's lawyers, after they had taken judgment and learned of the S. R. 22 insurance, cheerfully and willingly accepted the blessings fate had bestowed upon them and did not want to lose them by having the insurer know of the judgment, and so did not tell the adjuster of its existence, but this does not show an earlier plot to mislead Walker and the insurance company and bring about the result which, in fact, occurred.

We think Judge Carter was clearly wrong in his findings of fact and that he erred in his application of the law. Under the facts and the authorities cited, Walker was validly served and, this being so, the insurance company has no basis in law for relief because it was not made aware of the judgment. *National Indemnity Co. v. Simmons,* 230 Md. 234, and *Barrella v. Stewart,* 228 Md. 378.

> *Order appealed from, striking the judgment of the appellant against appellee, reversed, with costs, and the judgment reinstated.*

HORNEY, J., filed the following dissenting opinion.

The facts and circumstances of this case do not compel a reversal. To me, the evidence was such as to warrant the lower court finding, as it did, that the judgment was void for want of valid service of process on the defendant-appellee. On the one hand, the testimony of the defendant was to the effect that the private process server, on leaving the suit papers with him, told him that they were some sort of record of his accident and that he could turn them over to his insurance company if he wanted to. The defendant further testified that he was never informed, and did not understand, that he had been sued or was a defendant in a law suit. Because he had already been exonerated of having caused the accident, the defendant also stated that what was said by the process server, had the effect of lulling him into a state of complacency for the time being.

On the other hand, the process server testified at some length that he carefully checked the fact that the defendant was the person being sued, that he explained each of the papers, con-

sisting of a copy of the declaration, summons, interrogatories and request for admission of facts, and that he impressed the defendant with the seriousness of the matter and advised him to turn the papers over to his insurer immediately. Yet the attorney for the plaintiff-appellant, before demanding payment of the default judgment obtained while negotiations were in progress with the insurance company for a settlement of the plaintiff's claim, dispatched a law student to visit the defendant for the purpose of getting a written statement from him to the effect that he had been served with suit papers some three months before, but had not turned them over to his insurance company as he had been instructed to do by the person who had given the papers to him. Five days later, the attorney himself revisited the defendant because he was not satisfied with the statement the law student had taken. On cross-examination the defendant testified that the statement he signed was not as long as the one introduced into evidence.

The rule in Maryland, as the majority points out by citing a number of cases, including *Weisman v. Davitz*, 174 Md. 447, 199 Atl. 476 (1938), and *Little v. Miller*, 220 Md. 309, 153 A. 2d 271 (1959), is that the return of service of process is presumed to be true and accurate and a mere denial by a defendant, unsupported by corroborative evidence or circumstances, is not enough to impeach the return of service. But that was not, as the record shows, the situation here. Not only was there testimony to the effect that the defendant had been misinformed and led to believe that the papers the process server left with him were unimportant, which, in my opinion, constituted something more, under the circumstances of this case, than a *mere denial* of service of process, but there was strong corroboration of the defendant's testimony in the fact that the plaintiff or her attorney had reason to doubt the propriety of the service of process or else it would not have been expedient for her agent and attorney to subsequently visit the defendant, not once but twice, to obtain statements from him that he had been served with suit papers.

While the delivery of copies of the process and original pleading, see Maryland Rule 104 b (1) and (2), without any explanation would satisfy the rule, a delivery coupled with a

statement intimating that the suit papers were being delivered not as a notice of the filing of suit but as a record of an accident out of which the suit arose, as was the case here, should not, in my opinion, be accepted as valid service under the rule. Cf. *In Re Bonesteel's Will,* 228 N. Y. S. 2d 301 (1962). See also *Hunstock v. Estate Development Co.,* 126 P. 2d 932 (Calif. 1942).

The question here is really one of credibility of witnesses and the trial judge chose to believe the defendant. Regardless of any misapplication of the law, it is my opinion that the lower court was not clearly wrong in finding that the presumption in favor of the correctness of the return had been overcome. The order appealed from should be affirmed.