McGINNIS ET AL. *v.* ROGERS ET AL.

\* \* \*

URCIOLO ET AL. *v.* ROGERS

[No. 465, September Term, 1970.]

*Decided June 30, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Charles C. W. Atwater,* with whom were *David A. Carney* and *J. Edward Martin, Jr.,* on the brief, for Arthur J. McGinnis and Charles Dudley, part of appellants and cross-appellees. *Richard T. Brice, IV,* for Raphael G. Urciolo, part of appellants. No brief filed on behalf of Joseph Urciolo, other appellant.

*C. Edward Hartman, II,* with whom was *Stanley E. Hartman* on the brief, for John J. Rogers, part of appellees. No brief filed on behalf of other appellees.

FINAN, J., delivered the opinion of the Court.

Upon the first argument of this case before this Court, the appellants were Arthur J. McGinnis and Charles Dudley, who, as complainants below and as the named contract purchaser and assignee had filed a bill for specific performance of a contract for the sale of land against John J. Rogers and Helen A. Rogers, his wife, and Thomas E. Chance. Also joined as defendants were Helen L. Clarke, Joseph Urciolo, John V. Arban, Pascal della Badia and Florence E. Urciolo whose relationship to the subject property will become apparent later in this opinion. Service was not obtained on the Rogerses. In

that action, the court below having granted the motion of Chance for summary judgment, dismissed the bill of complaint. We reversed and remanded, being of the opinion that there existed a genuine dispute as to material facts which rendered summary judgment inappropriate. We directed that further proceedings be taken in the nature of additional testimony and additional finding of facts. *McGinnis v. Chance,* 247 Md. 393, 231 A. 2d 63 (1967).

In order to provide an understanding of the roles played by the various parties, we shall endeavor to consolidate the facts of *McGinnis v. Chance, supra,* with those of the record of this case in its present posture on appeal. In the court below, Judge E. Mackall Childs, in a well reasoned opinion, performed an able task of unravelling an intricate web of evidence, for which we are duly grateful.

Mr. John L. Rogers, who at the most recent trial was 69 years of age, is a man whose formal education terminated after the sixth grade. In 1936, he and his wife, now deceased, purchased from Anne Arundel County a 48 acre tract (the subject property) which the County had acquired at a tax sale in 1932. However, it was not until 1940 that a deed was executed by the county treasurer. Rogers has receipted tax bills for the years 1941 through 1964. There is no question that he, although not living on the property, exercised many acts of dominion over it. On April 4, 1963, McGinnis, for the consideration of $200, obtained from the Rogerses a thirty day option to purchase the tract for $50,000. On May 3, 1963, McGinnis gave notice of his intent to exercise this option and shortly thereafter, with the Rogerses' permission, removed timber from the property which McGinnis sold for $1700; however, he did not settle as required and attempted to sell his option to one Hurd. Hurd obtained information concerning the questionable validity of the tax sale held in 1932 and returned the contract to McGinnis. When McGinnis mentioned the title problem to Mr.

Rogers, Rogers said "Well, look, if you want to get the title cleared up you go ahead. I don't want to spend any money." McGinnis did not pay any of the $1700 which he received from the timber to the Rogerses, and in a sense this may have set the flavor of his dealing with them.

Thereafter, McGinnis employed William Dixon, Esq., President of Monumental Title Company, a real estate attorney and developer, and a member of the Maryland Bar, who prepared a new contract for his client, McGinnis. That contract, entered into on September 23, 1963, between Rogers and McGinnis provided for a deposit of $200 (which was not paid) and a purchase price of $50,000 to be paid by a $10,000 down payment and a $40,000 four per cent purchase money mortgage back to Rogers. With regard to the defective title, the contract provided in pertinent part:

> "Settlement to be on or before ninety (90) days from the date that the sellers are able to give such title as a title insurance company permitted to do business in the State of Maryland will approve and insure * * *."
>                    * * *
> "Buyer will immediately proceed with due diligence to clear title to said property but in no event will the time of this contract exceed eighteen (18) months."

Approximately one week later (October 1, 1963), McGinnis assigned his contract to Charles Dudley for a named consideration of $10,000, of which $6,000 was paid. Dixon then represented Dudley in all matters relating to the contract. Dixon caused a search of the title to be made by Garrett Larrimore, Esq., a member of the Maryland Bar, and also had a survey made by Mr. Edward Hall. This was in the early part of 1964. Also, about this time Hall notified Dixon that he had learned that Mr. Thomas E. Chance, a person known to deal in tax delinquent properties in Anne Arundel County, had evinced considerable interest in the property and was en-

deavoring to obtain quitclaim deeds from the heirs of William H. Queen, the individual who had been vested with title to the property prior to the tax sale in 1932. Dixon telephoned Chance and informed him of the existing contract between the Rogerses and McGinnis and of the assignment to Dudley, and advanced the opinion that the Rogerses' title was valid based on adverse possession. Dixon, however, did not communicate this development to the Rogerses, who were unaware of Chance's activities. Dixon was hopeful that the defect in the tax sale would be remedied by the passage of Chapter 182 of the Laws of Maryland of 1964, which provided that all tax sales prior to 1944 in Anne Arundel County could not be subject to further attack after June 1, 1966. However, this policy of watchful waiting exposed McGinnis, Dudley and Dixon to the risk that the McGinnis contract would expire on March 23, 1965, as the contract expressly provided for final settlement within eighteen months from its date of September 23, 1963, and if no extensions were granted by the Rogerses, the McGinnis contract would terminate. The record reveals that the McGinnis-Dudley-Dixon combination did little or nothing to prepare for the final settlement date, and it was not until late in 1964 (the evidence not being clear as to the exact date) that Dixon sought the advice of John P. O'Ferrall, Esq., a title specialist in Baltimore. O'Ferrall observed that the Rogerses might well sustain a title based on adverse possession, having been in possession and control of the property under a deed from the county treasurer from 1940 to the date of his report; however, he also cited the curative effect of Chapter 182 of the Laws of 1964. Dixon, however, states that he was apprehensive about filing legal action lest the case be lost, thereby exposing Dudley and McGinnis to a possible suit for damages by the Rogerses.

Meanwhile, on June 23, 1964, Thomas Chance had obtained deeds from the Queen heirs in favor of his nominee, Helen L. Clarke, and on July 21, 1964, she, as agent for Chance, filed a bill of complaint (Equity No. 16,484)

in the Circuit Court for Anne Arundel County asserting the invalidity of the 1932 tax sale and alleging that she was vested with title and should be entitled to the property upon payment of past due taxes. On October 19, 1964, the Circuit Court for Anne Arundel County entered a decree setting aside the tax sale. However, prior to the determination of that case there was yet another chapter being played out which affected the course which the instant case was to follow.

The equity suit filed by Helen Clarke against the Rogerses caught that couple completely unaware. Mr. Rogers states that it was the first time in his life that he had ever been sued. He did not know that anyone had designs on the title to his property and to compound his troubles his wife at this time was seriously ill with cancer. In desperation, he turned to his long-standing friend and spiritual advisor, Father Hugh O'Neil. Father O'Neil urged that Rogers retain Winson G. Gott, Jr., Esq., a member of the Maryland Bar from Anne Arundel County, to try to delay proceedings until Raphael Urciolo, Esq. (Urciolo) a member of the District of Columbia Bar, returned from Europe. Father O'Neil had a transcendent opinion of Urciolo, whom he had taught in college, and upon the latter's return to this country Father O'Neil immediately introduced him to Mr. Rogers. Rogers, with complete faith, placed his affairs totally in the hands of Urciolo.

We digress for a moment to point out that when this case was first heard by this Court we had misgivings as to whether the *Clarke v. Rogers* equity suit was of a true adversary nature. The evidence produced on remand clears this up completely and as Judge Childs unequivocally states: "[He] has no hesitancy in pronouncing it to be so. There was no evidence whatsoever that Chance's nominee, Helen L. Clarke, nor Chance, nor C. Osborne Duvall, Esq., who was representing Clarke, had ever known Rogers before the suit was filed."

At Uricolo's behest, the Rogerses entered into an agreement with Clarke to the effect that, regardless of the out-

come of the equity case, the property would be titled in the name of Clarke and the Rogerses—one-half interest in each—and that this agreement was reached "either prior to or simultaneously with" the taking of testimony in that case. Urciolo also explains that he advised settlement because he thought it might be difficult for the Rogerses to rest their title on adverse possession and that he had misgivings about the validity of the tax deed. At the close of the *Clarke v. Rogers* equity case, upon Urciolo's advice, the Rogerses executed an agreement dated September 17, 1964, whereby both they and Helen L. Clarke agreed to convey the subject tract to Chance and Joseph Urciolo (brother of Raphael) as "joint tenants to be held by them for the benefit of the parties to this instrument (the Rogerses and Clarke) as hereinafter set forth."

It must be noted that this agreement between the Rogerses and Clarke recognized the existence of the McGinnis contract and the testimony revealed that Urciolo and Chance were both of a mind that Clarke and the Rogerses were to be bound by whatever decision McGinnis would make as to a settlement on or before March 23, 1965. However, they wanted nothing to be filed in the land records referring to this outstanding contract commitment pending the expiration of the McGinnis option, which they hoped would expire and which eventually did expire. It is obvious that Urciolo viewed the McGinnis contract with ambivalence, expressly recognizing its existence in the Rogers-Clarke agreement, yet testifying that he considered that the contract could be easily "set aside" because neither McGinnis, Dudley nor Dixon had done anything affirmatively to clear the title, as required under the contract.

When the case was previously heard by this Court we noted that Dixon made numerous attempts between early January and March 1, 1965, to contact Raphael Urciolo, attorney for the Rogerses. Urciolo admitted that he received many messages that Mr. Dixon had called, but re-

turned none of the calls. He also acknowledged receipt of a telephone call on March 2, 1965, wherein Dixon outlined to him the questions raised in the O'Ferrall memorandum and the recommendation which it contained advising that the best way to perfect the Rogerses' title was to wait until June 1, 1966. Urciolo replied to Dixon: "Well, send me a copy of the memorandum and I'll be in touch with you." Dixon, in response to this request of Urciolo, sent him a copy of the memorandum on March 3, 1965, and in the accompanying letter stated: "We would like to go through with this contract but would like to postpone it until after June 1, 1966." Dixon, not having heard further from Urciolo, made efforts to contact both him and Mr. Rogers. He did contact Rogers, who referred him to Urciolo, and having heard nothing further, he apparently sought to relieve his frustration by recording on April 4, 1965, the contract between McGinnis and the Rogerses dated September 23, 1963. Further efforts to contact Urciolo having failed, Dixon wrote on April 22, 1965 (almost a month after the expiration of the contract) informing him that the contract had been recorded and that he was interpreting Urciolo's failure to contact him as an acquiescence in an extension of the settlement date of the agreement.

The evidence also reveals that after some fifteen months of silence, McGinnis telephoned Rogers in December of 1964, or January of 1965, the testimony as to the exact date being unclear, and informed him that he was desirous of discussing a third extension of the final settlement date. Rogers referred him to his attorney, Urciolo. Again, about 7 or 10 days prior to the expiration date of the contract, McGinnis contacted Rogers requesting Urciolo's telephone number and address.

On March 24, 1965 (one day after the expiration date of the McGinnis contract) Rogers and Helen Clarke executed their deed conveying title to Chance and Joseph Urciolo as joint tenants. This deed was recorded the following day. On May, 26, 1965, Chance and Joseph Urciolo

sold the subject property to a combine composed of John B. Arban, Pascal della Badia, and Florence Urciolo, wife of Raphael, for $94,600.[1] A purchase money mortgage was executed in favor of Chance and Joseph Urciolo in the amount of $70,000 and $24,600 was paid in cash. Seventy one hundred dollars ($7100) of the cash down payment was paid to Thomas Chance (Chance and Rogers compromised and dismissed their claims against each other during the trial below) and the balance has apparently been retained by one or more of the Urciolos.

On June 11, 1965, Dixon learned from Hall, the surveyor, that some deeds had been recorded affecting the Rogerses' title. Dixon ordered a run-down of the title which disclosed not only the deed from the Rogerses and Helen Clarke to Chance and Joseph Urciolo on March 24, 1965, and the subsequent conveyance by Urciolo and Chance to John B. Arban, et al, on May 26, 1965, but also the 1964 equity proceeding of *Clarke v. Rogers,* of which McGinnis, Dudley and Dixon had been unaware (but of which they most assuredly would have been aware had they caused a run-down to have been made of the title in preparation for final settlement in March of 1965). Whereupon, Dixon contacted Chance on June 15, 1965, and informed him that, in his opinion, the *Clarke v. Rogers* equity proceeding was a nullity. Thereafter, McGinnis and Dudley filed their bill of complaint on July 2, 1965, wherein they requested specific performance of their contract with the Rogerses and asked that the court declare null and void the *Clarke v. Rogers* equity proceeding and the deeds subsequently executed affecting the property.[2]

1. In a companion appeal, Arban v. Rogers, 262 Md. 738, 279 A.2d 457 (1971), this group is referred to as a partnership.
2. Adding a bizarre touch to this case is the fact that the Rogerses left for Arizona immediately after the execution of the deed to Urciolo and Chance on March 24, 1965. Mrs. Rogers died in Arizona and Mr. Rogers knew nothing of subsequent events in this matter until his return in the summer of 1967 when he was served with summons in this case. (When we heard this case on the first appeal we did not have the benefit of his testimony.) Al-

After our opinion in *McGinnis v. Chance, supra,* the following efforts of the litigants to improve their positions transpired in the lower court:

Chance attempted to have William Dixon brought in as a party in interest, but this was denied by the court. Service was obtained on John J. Rogers, and he filed an answer. Rogers then filed a cross bill of complaint against McGinnis, Dudley, Joseph J. Urciolo, Raphael Urciolo (who had not been named in the original bill of complaint), Arban, della Badia, and Florence Urciolo. Raphael Urciolo cross-claimed against Chance. Chance in turn counterclaimed against Rogers and cross-claimed against Raphael Urciolo. Arban, della Badia, and Florence Urciolo cross-claimed against Rogers, Chance, and Joseph J. Urciolo, requesting a rescission of their deed and purchase money mortgage and the return of their $24,000 down payment. Rogers also counterclaimed against McGinnis and Dudley for failure to act with due diligence to clear the title to his property in keeping with their contractual obligations. As already noted, Chance and Rogers compromised and dismissed their claims against each other by an agreement dated August 7, 1969, and Chance agreed to assign his interests in the purchase money mortgage to Rogers. Also, a decree pro confesso was entered in the claim of Rogers against Raphael and Joseph Urciolo.

It should also be noted that upon remand before Judge Childs it became known that none of the payments of principal or interest called for under the purchase money mortgage from Arban et al, had been made during the six years that they had held title to the property. The chancellor properly held the mortgage to be in default. It was further demonstrated that Rogers had never received one penny of the proceeds from the sale of his property. After a plenary hearing on this matter, in

though the property had been sold and settlement made some two years previous by Chance and Joseph Urciolo, Rogers knew nothing of the settlement.

which the chancellor had the customary opportunity to view and assess the demeanor and credibility of witnesses during three days of testimony, and on the facts as we have outlined them, the court entered a decree in which it dismissed McGinnis' and Dudley's bill of complaint requesting specific performance of their contract for the purchase of the property from the Rogerses; upheld the validity of the deed executed by Mr. and Mrs. Rogers and Helen Clarke to Chance and Joseph Urciolo dated March 24, 1965; affirmed the validity of the deed of May 26, 1965, from Chance and Joseph Urciolo to Arban et al; sustained the validity of the purchase money mortgage dated May 26, 1965, from Arban et al, to Chance and Joseph Urciolo and further decreed:

"II. [Covered above.]

\* \* \*

"D. That the full principal and interest indebtedness set forth in the aforesaid mortgage are due and payable as prescribed in the mortgage without offset for any reason, except payment to Thomas Chance for J. Urciolo.

"E. That pursuant to the agreement of August 7, 1969, between John Rogers and Thomas Chance filed in these proceedings, Thomas Chance forthwith execute an assignment of the mortgage described in paragraph C above to John J. Rogers.

"F. That Joseph Urciolo forthwith execute an assignment of the mortgage described in paragraph C above to John J. Rogers and deliver the mortgage and assignment to counsel for Rogers.

"G. That Joseph Urciolo forthwith pay over to John Rogers' counsel, for John Rogers' benefit, any and all sums received on account of principal or interest paid on the mortgage indebtedness, together with a com-

plete account on oath of said Urciolo as to the dates upon which the various sums, if any, were paid against the principal and/or interest called for under the terms of said mortgage.

"H. That Raphael Urciolo and Joseph Urciolo account and forthwith pay over to John Rogers' counsel, for John Rogers' benefit, the sum of $16,151.62 together with interest from June 12, 1965.

"I. That the option contract of April 4, 1963 and the contract of sale of September 23, 1963, both between John J. Rogers, et ux and Arthur J. McGinnis, the later contract recorded among the Land Records of Anne Arundel County in Liber LNP 1847, folio 228, be and the same are hereby declared null and void.

"III. That the counterclaim of Thomas E. Chance against John J. Rogers be and the same is hereby dismissed with prejudice.

"IV. That the cross-claim of Thomas E. Chance against Raphael G. Urciolo, et al, be and the same is hereby dismissed with prejudice.

"V. That the cross-claim of Raphael Urciolo against Thomas E. Chance be and the same is hereby dismissed with prejudice.

"VI. That the counterclaim of Raphael Urciolo against Dudley and McGinnis be and the same is hereby dismissed with prejudice.

"VII. That the cross-claim of Arban, della Badia, and Florence E. Urciolo be and the same is hereby dismissed with prejudice. [These parties did not appeal.]

"VIII. That the counterclaim of Rogers against McGinnis and Dudley be and the same is hereby dismissed with prejudice. [Rogers did not take a cross-appeal.]

"IX. That costs of the proceedings be divided among plaintiffs, Arban, della Badia, F. Urciolo, J. Urciolo and R. Urciolo."

McGinnis and Dudley appealed from those portions of the decree which dismissed their bill of complaint for specific performance and upheld the validity of the Clarke and Rogerses' deed to Chance and Joseph Urciolo (March 24, 1965), the deed of Chance and Joseph Urciolo to Arban et al (May 26, 1965) and the purchase money mortgage.

Raphael Urciolo filed an appeal from paragraphs V and VI of the decree only, being respectively a dismissal of his cross-claim against Chance and the dismissal of his counterclaim against Dudley and McGinnis. No appeal was filed by him with respect to the decree in personam against him, apparently on the premise that the court did not have jurisdiction over him to render such a decree. Joseph Urciolo also contested jurisdiction of the court on the premise that he had never been served with a copy of the original bill of complaint. The court eventually decided that it had jurisdiction over Raphael Urciolo and leave was granted to Rogers to effect proper re-service of his cross bill on Joseph, which was accomplished. Although Joseph Urciolo appealed, he did not file a brief.

The final chapter in this case begat a new cause of action, Equity No. 19, 637 in the Circuit Court for Anne Arundel County, which was a mortgage foreclosure proceeding brought by John J. Rogers, assignee, against Arban, della Badia and Florence E. Urciolo, appearing as mortgagors in the mortgage covering the subject property and which proceeding sired a companion appeal to the case at bar. *Arban v. Rogers,* 262 Md. 738, 279 A. 2d 457 (1971). We mention that litigation at this juncture because its affirmance or reversal could have an effect on the type of relief decreed in the instant case. Certainly its affirmance would render specific performance of the McGinnis contract impossible and would

only allow them an alternate relief by way of damages, were we in this case to find that the lower court erred and that they were entitled to relief. Since we have previously stated that we affirm the decree of the lower court in all respects, we see no need for further reference at this time to the mortgage foreclosure sale.[3]

Fortunately, the law applicable to this case is not as complicated as the facts. When this matter was first heard by Judge Sachse in the court below it was on a motion by Chance for summary judgment and the court made its determination on the basis of the pleadings, depositions and affidavits. On appeal, we expressed the opinion that material facts were in dispute which placed the matter beyond the pale of summary judgment. We pronounced concern over the question of whether the *Clarke v. Rogers* equity suit (No. 16,484 Equity in the Circuit Court for Anne Arundel County) was a true adversary proceeding, particularly regarding the complicity, if any, of Mr. John Rogers, who had not been served as a party in the original action. We viewed the facts as permitting the inference that Chance and Urciolo might have acted in concert to frustrate the purpose of the contract between McGinnis and the Rogerses. Further, the evidence was subject to the interpretation, without explanation, that Raphael Urciolo might have misled Dixon into thinking he was going to receive an extension of the March 23, 1965, settlement date. The victimization of the Rogerses was not at all apparent. As Judge Childs stated, after hearing the testimony of the brothers Urciolo, he could "fully understand the malaise that the Court of Appeals had upon reviewing the record." After remand, the record now presents us with a plethora of facts which

---

3. However, an explanation is in order as to why these complicated proceedings need to have been rendered more involved by the mortgage foreclosure. The chancellor properly held that the mortgage was in default. On November 14, 1969, Rogers, as the beneficial owner of the mortgage, filed foreclosure proceedings as titled above. The chancellor held that because of the absence of a supersedeas bond, the foreclosure action should not be forestalled and that the sale should be completed.

stills any misgivings we may have harbored regarding the chancellor's refusal in the first proceeding to grant specific performance of the McGinnis-Rogers contract. We shall discuss the rights of the parties in the order in which they were affected by the chancellor's decree.

## I

## DISMISSAL OF THE BILL OF MCGINNIS AND DUDLEY FOR SPECIFIC PERFORMANCE

The record on remand has strengthened the original finding of Judge Sachse, as has been pointed out with clarity by Judge Childs, that McGinnis and Dudley slept on their rights. The contract of September 23, 1963, expressly states, "Buyer will *immediately proceed with due diligence to clear title* to said property *but in no event will the time of this contract exceed eighteen* months." We find an appropriate analogy in the case of *Development Sales Company v. McWilliams*, 254 Md. 673, 255 A. 2d 1 (1969), in which there was a contract for the purchase of land calling for zoning to be obtained by the purchaser within eighteen (18) months, with extension at the consent of the owners, should it prove necessary. Otherwise, the contract was to terminate. In that case, although the purchasers diligently pursued rezoning, they were unable to obtain it within the time limit stipulated in the contract. The owners would not grant an extension and this Court held:

> "* * *[W]e are of the opinion that the contract terminated according to its own terms and provisions when the zoning classification sought for had not been obtained within eighteen months from the date of the contract, and no consent to extend the contract or to further pursue the zoning reclassification was forthcoming from the McWilliamses. The contract was predicated on a contingency which was not fulfilled. Thereafter, the McWilliamses, as Sellers, were free to negotiate with whomsoever they may have

chosen to negotiate a new contract." 254 Md.
678-679.

The law is well settled that when the optionee obligates
himself to perform a required condition within an agreed
time he must perform the condition within the time
agreed upon at the risk of losing his option. *Schlee v.
Bryant,* 247 Md. 689, 697, 234 A. 2d 457 (1967).

Another case in which the condition precedent for the
execution of the option to purchase was the rezoning of
the tract, is *Michael v. Towers,* 253 Md. 114, 251 A. 2d
878 (1969). The language used in *Towers* regarding the
contingency of rezoning was quite similar to that found
in the case at bar regarding the clearing of the title. In
*Towers* the contract provided:

> "Purchaser shall apply for rezoning immedi-
> ately and shall *prosecute the application for re-
> zoning with due diligence and as expeditiously
> as possible,* with all expense therefor being
> charged to the purchaser without obligation to
> the Seller." (Emphasis supplied.)

The Court speaking through Judge Singley said:

> "Here the contract provided that the purchaser
> would proceed with diligence and expedition. He
> had more than two years in which to act be-
> tween the signing of the contract and the filing
> of the suit and nearly a year from the filing of
> the suit to the time when the case was heard.
> The conclusion that the zoning problem could
> have been resolved in either of these periods is
> as nearly irrefutable as can be imagined, and
> proof of Michael's lack of activity established
> a prima facie case for Mrs. Brown and the
> Towers." 253 Md. 119.

Also as to what constitutes reasonable diligence, see
*Atholwood Development Company v. Houston,* 179 Md.
441, 446, 19 A. 2d 706 (1941); *Stern v. Schapiro,* 138

Md. 615, 626, 627, 114 A. 587 (1921) ; and cf. *Jones v. Saah*, 261 Md. 340, 344, 275 A. 2d 165 (1971). The chancellor was aware of the thrust of these authorities when he observed:

"* * * Dixon, knowing the date on which the option was to expire, had not taken the barest minimum of preparation in the event of an adamant refusal to extend the option. He had not undertaken to bring the title to date to protect his client from possible newer developments in the title nor had he prior to filing suit actually made anyone an unequivocal offer to settle or tendered performance. * * * If he were convinced as he now says he is of the validity of Rogers' title through adverse possession, there would be no reason why his client could not have taken title within the option period and then await the final protection of the provisions of Chapter 182 of the Acts of 1964."

To this we would add that Dixon did practically nothing about clearing the title for the first ten months after the Rogerses had given the option and he testified that in June of 1964 he was told that the deeds of the Queen heirs had been executed and were about to be recorded. He elected to take a passive course of action (which undoubtedly entailed less effort and expense) and in fact exhibited little concern until the approach of the termination date of the option in the early part of 1965. Such lackadaisical conduct is scarcely compatible with the obligation to "immediately proceed with due diligence."

The appellants McGinnis and Dudley also contend that Rogers and his attorney Urciolo were guilty of conduct which should estop them from refusing to extend the termination date of the contract. Specifically, they refer to the failure to inform McGinnis and Dudley of the *Clarke v. Rogers* equity suit (the existence of which they argue made it impossible for McGinnis to clear the title) and

also Urciolo's actions near the end of the option period when he failed to respond to Dixon's desperate pleas for an extension of final settlement and a response by Urciolo in some manner to O'Ferrall's memorandum on the status of the title.

First of all, if we hold, as we do, that McGinnis and Dudley breached their obligation under the contract to "immediately proceed with due diligence" to clear the title, they could not avail themselves of the doctrine of estoppel, for those who would invoke the equitable relief of specific performance cannot themselves be guilty of a breach of the contract. However, assuming arguendo, that they did not breach the contract, we agree with the chancellor that there are no facts or circumstances that give rise to an estoppel on the part of Rogers or Urciolo.

The evidence shows that Dixon, McGinnis' attorney, knew about the Chance deeds and challenge to Rogerses' title before any of the other parties. Furthermore, the testimony is undisputed that Chance and the Rogerses in agreeing to the disposition of their respective claims (when they settled the *Clarke v. Rogers* equity suit), agreed they would abide the decision of McGinnis as to his exercising or not exercising his option. Additionally, on the facts of the present record, it is obvious that for Dixon to have assumed by Urciolo's silence that he was extending the option period is nothing more than the most fanciful type of wishful thinking.

It is true that this Court has at times held that silence may be the basis for creating estoppel where one maintains his silence while observing another person act to that person's detriment, as well as to the detriment of the party who remains silent. *Bean v. Steuart*, 244 Md. 459, 468, 224 A. 2d 295 (1966). However, there was nothing in Urciolo's silence which would have justified Dixon's not endeavoring to continue his efforts to clear the title to the land up to the last minute that the option was in effect, or to exercise the option on the theory that the Rogerses had a good and sufficient title based on adverse possession; nor do we recognize any obligation on the

part of either Urciolo or Rogers to inform McGinnis, Dudley or Dixon of their agreement with Chance. This agreement was a legitimate business end which Rogers had a right to pursue to protect his own interests.

As previously noted, the record in the instant case, primarily through the testimony of Mr. Rogers reveals an abundance of evidence to show that the *Clarke v. Rogers* equity suit was a bona fide adversary proceeding. Once that is acknowledged the sinister gloss which Urciolo's actions might otherwise mirror, as was the case in the original proceeding, is dissipated. We are also of a mind that the determination that the *Clarke v. Rogers* equity suit was a true adversary proceeding, which Clarke and the Rogerses had a right to compromise, quells any contention that Chance or the Urciolos were guilty of tortious interference with the McGinnis contract with the Rogerses. We would further note that this issue of tortious interference with their contract with the Rogerses was not raised below by McGinnis or Dudley and we do not think that it is properly before us on this appeal. (Maryland Rule 885.) However, were it before us on the basis of the evidence in the record, we would be compelled to hold that such a claim was without merit.

## II

## THE CLAIM OF JOHN ROGERS AGAINST RAPHAEL G. URCIOLO AND JOSEPH J. URCIOLO

The following language of Judge Childs in the opinion of the lower court aptly describes the machinations of Raphael Urciolo with regard to his representation of Mr. Rogers:

> "The shepherd [in this instance Father O'Neill] having in good faith entrusted his sheep unto the hands of Raphael G. Urciolo, the latter carried out his trust by attempting to fleece Rogers. As illustrative of this point the brothers Urciolo unauthorizedly and illegally charged Rogers $12,425 for his part of the overall trans-

action and still retain the entire balance of proceeds from the sale.[4]

And, as the trier of facts, the chancellor further stated:

"Mr. Raphael Urciolo admitted in open court on the third day of testimony that he, being unlicensed in Maryland, was not entitled to attorney's fees. Nor is his real estate firm licensed in Maryland, yet the Urciolos have received some $29,000 in commissions on two Rogers' sales. The court has yet to receive a satisfactory explanation as to why a straw man named in a deed is entitled to claim a 'trustee's commission' nor of the basis for the commission charge. It seems clear to the court that this charge was a mere sham and guise whereby an unsuspecting and trusting old man was further deprived of the product of his life's labors. Added to this circumstance was the fact that Raphael Urciolo at the sale of the property was representing both buyers and sellers without divulging his dual role to either. Even were this not so, and even had the Urciolos been licensed brokers and attorneys in Maryland, transactions arising out of an attorney-client relationship when challenged are prima facie void, and the attorney has the burden of proving understanding on the part of his client and fairness and absence of undue influence and deception. *Lopez v. Lopez,* 250 Md. 491."

The chancellor further found that both Raphael and Joseph Urciolo had attempted (and up to the date of the decree had done so successfully) to deprive Rogers of his portion of the $24,000 down payment on the property made to Joseph Urciolo in May of 1965, when the prop-

4. The $12,425 the chancellor refers to consisted of a broker's commission of $9,460, a trustee's commission of $2,365 and an attorney's fee in the Clarke v. Rogers equity case in the amount of $600.

erty was conveyed to the Arban-Urciolo combine. Rogers emphatically testified that he did not employ the Urciolo Realty Company as a broker nor appoint Joseph Urciolo as a trustee. The trust agreement of September 17, 1964, whereby Clarke and the Rogerses conveyed in trust their interest in the property to Chance and Joseph Urciolo, did not provide for any trustees' commissions.

The testimony of Joseph Urciolo, who is also a practicing attorney in the District of Columbia, would be disarming if one were to believe him to be as naive as his characterization of his role in this transaction would indicate. He states:

Answer: "He's [meaning Raphael] an older brother. He was handling the thing from the beginning and I didn't know anything about it. I didn't know what was going on * * *."

Question: "Mr. Urciolo you have no personal interest—"

Answer: "None."

Question: "In any funds?"

Answer: "None, whatsoever."

Question: "Mr. Urciolo, what is the Urciolo Realty Company?"

Answer: "It's a real trade name for a duly licensed brokership in Washington, D.C. and it is the trade name of Raphael G. Urciolo."

Against such a factual background, the chancellor correctly held that, in addition to his interest in the purchase money mortgage, Rogers should have received from the $24,000 deposit, the sum of $7,191.62 (being equal to the amount received by Chance) and the improperly charged real estate commissions of $9,460 (Chance, at the time of the decree, having assigned all of his interest to Rogers), less the $500 fee which Winson Gott, Esq. received. Raphael Urciolo, as settlement attorney, should have paid Rogers $16,151.62 or held this amount

in trust for him. To have held otherwise would have been to overlook the age-old principle applicable to fiduciary relationships that, unless there is a full disclosure by the agent, trustee, or attorney of his activity and interest in the transaction to the party he represents and the obtaining of the consent of the party represented, the party serving in the fiduciary capacity cannot receive any profit or emolument from the transaction. This is true even when the transaction benefits the principal or client, which does not readily appear to be the case in this transaction. *Maryland Credit v. Hagerty,* 216 Md. 83, 90-92, 139 A. 2d 230 (1958). In *Gerson v. Gerson,* 179 Md. 171, 177, 20 A. 2d 567 (1941), the Court, quoting from *Chase v. Grey,* 134 Md. 619, 623, said:

" '* * * Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a confidential relation exists as a fact in which there is a confidence reposed on one side, and the resulting superiority and influence on the other. The relation and duties involved in it need not be legal; it may be moral, social, domestic, or merely personal.' * * * 'No part of the jurisdiction of the court is more useful than that which it exercises in watching and controlling transactions between persons standing in the relation of confidence to each other * * *. The jurisdiction is founded on the principle of correcting abuses of confidence, and I shall have no hesitation in saying it ought to be applied whatever be the nature of the confidence reposed, or the relation of the parties between whom it has subsisted.' "

Certainly the factual pattern of the case at bar may be cast in such a mold, insofar as the relationship between Raphael Urciolo and Rogers is concerned.

## III

## THE URCIOLOS' CHALLENGE TO JURISDICTION

After three days of trial in the court below and the awarding of a monetary judgment in favor of John Rogers against Raphael Urciolo and Joseph Urciolo jointly, together with costs, Joseph Urciolo for the first time alleged that he had not been served with the original bill of complaint by McGinnis and Dudley, nor had he ever filed an answer to that suit, and on this premise challenged the court's jurisdiction over him. Raphael Urciolo maintained that he had not been properly served with the cross bill of John Rogers and challenged jurisdiction and joined his brother in a motion to set aside the decree filed September 29, 1969.

We regret that we must prolong this opinion by discussing the merits of the Urciolos' contention of lack of jurisdiction, which the chancellor characterized as frivolous, yet, we are of the belief that the issues raised should be answered to still the possibility of continued litigation. From the record it appears that the first activity in this case after John Rogers filed his answer to the bill is a motion titled, "Motion of Defendants Raphael G. Uricolo and Florence E. Urciolo to Advance or Continue Trial" and contained the following language:

> "Come now the *defendants,* Raphael G. Urciolo, *pro se* * * *"
> "The *defendants,* Raphael G. Urciolo * * *"
> "Among the objects of said trip are a series of lectures to be given by *defendant,* Raphael G. Urciolo. * * *"
> * * *
> "The *defendant,* Raphael G. Urciolo, certified that he has made known to all other counsel of the matters * * *." (Emphasis supplied.)

At this stage of the litigation, Raphael Urciolo had not been named as a party defendant and there was no obli-

734

gation for him to appear in any capacity. The motion he filed to fix a trial date was not relevant to any issue of jurisdiction. This motion was filed because he obviously considered himself a real party in interest and intended to participate in the trial on its merits. There is no question but that by this motion he was seeking the assistance of the legal process of the court in his favor. We think this was a pleading within the meaning of Maryland Rule 124 a 1, and by filing this pleading he made a general appearance for himself and the others whom he purported to represent, and thus accepted the jurisdiction of the court. *Eastham v. Young*, 250 Md. 516, 522, 243 A. 2d 559 (1968). *Cf. Metropolitan Auto Sales v. Koneski*, 252 Md. 145, 152, 249 A. 2d 141 (1969).

Subsequently, when Rogers filed his cross-claim, a copy was mailed by registered mail to Raphael Urciolo's office and its delivery was acknowledged by an employee named Cates. It appears from Raphael's testimony that Cates promptly delivered the cross-bill to him upon his return to his office. We think such service meets substantial compliance with Maryland Rule 306 c 2(b). There is no question but that Raphael Urciolo comes within the purview of the provisions of Maryland Code (1969 Repl. Vol.), Art. 75, § 96, which gives the courts of this State personal jurisdiction over nonresidents when such a person "acts directly [by way of] * * * (1) Transacting any business in this State; [or] * * * (5) Having an interest in using, or possessing real estate in this State; * * *."

Although actual delivery of the cross-claim sent by registered mail was made to his employee Cates, yet, under oath Raphael admitted prompt receipt of the letter from Cates. Therefore, there can be no question but that he had actual and timely receipt of the copy of Rogers' cross-claim and was fully apprised of its nature. *Cf. Heller & Company v. Kocher*, 262 Md. 471, 278 A. 2d 301 (1971).

Additionally, Raphael Urciolo participated fully in these proceedings for thirteen months, filing pleadings, answers, counterclaims, testifying, examining, and the

like. At no time did he ever ask that the order of court authorizing service be amended, or in any other way object to or appeal from the manner of service until October 28, 1969, the next to last day before the appeal time was to expire. His challenge to jurisdiction was in the form of a motion to set aside decree not enrolled. The court denied the motion because Raphael Urciolo, prior to filing a motion, had already appealed to this Court from that portion of the decree which denied his cross-claim against Chance and his counterclaim against McGinnis and Dudley, and the appeal was still pending. He did not appeal from the decree in personam obtained against him by Rogers.

The chancellor held that he was without jurisdiction to strike a judgment after an appeal had been entered, even though in this case the appeal was from only a portion of the decree. We are of the opinion that the action of the chancellor was proper. Urciolo, by filing his cross-claim against Chance and his counterclaim against McGinnis and Dudley, if he had not by his previous actions accepted the jurisdiction of the court (and we think that he had), certainly by these pleadings, did so. The chancellor lacked jurisdiction to set aside a decree not enrolled when the issue raised by the motion, i. e., lack of jurisdiction of the court, could have a bearing on the portion of the decree appealed. The appeal had not been withdrawn at the date of the hearing on the motion and we believe the following principle set forth in *Tiller v. Elfenbein,* 205 Md. 14, 21, 106 A. 2d 42 (1954) to be apposite:

"We think it is a sound policy that allows the trial court, despite an appeal, to retain its control over the judgment for thirty days after its entry, and for such reasonable time thereafter as may serve the court's convenience in disposing of a motion seasonably made, as contemplated by the Rules. On the other hand the exercise of the court's power to act on the motion

should not be stayed by the entry of an appeal, so as to work a postponement of the hearing of the motion, any more than the filing of the motion should postpone the time for, or hearing of, the appeal, for this would be capable of abuse, as suggested. We hold that, unless the appeal is dismissed when the motion comes on for hearing, the appellant must elect between his motion and his appeal. If the appeal is dismissed before the hearing, as in the instant case, the motion stands for hearing as though no appeal has been entered."

Furthermore, in *Giles v. DiRobbio*, 186 Md. 258, 261, 46 A. 2d 611 (1946), it was held that the trial court properly dismissed a petition to strike a judgment on the ground of newly discovered evidence, after an appeal from the judgment had been entered. The Court stated that "the lower court could not consider the petition after an appeal was taken to this Court." The appeal was still pending when the motion was heard. *Corey v. Carback*, 201 Md. 389, 405, 94 A. 2d 629 (1953), and *Dietrich v. Anderson*, 185 Md. 103, 111, 43 A. 2d 186 (1945).

With regard to Joseph Urciolo's challenge to the jurisdiction of the court on the grounds that he had not been served with a copy of the bill of complaint, we first note that Deputy United States Marshal Michael Colosanto filed an affidavit of service stating that he had served Joseph Urciolo on September 2, 1965, with a copy of the bill of complaint and the order of publication in this case. Thereafter on September 14, 1965, there was purportedly filed an answer signed by Joseph Urciolo. Although this answer cannot be found in the files of the clerk of the court, nonetheless copies were mailed by Joseph Urciolo to the counsel for the various parties in the case and one of such copies was filed in the proceeding as an exhibit. The chancellor characterized Urciolo's attempted explanation as to why he had mailed this answer to counsel of record, if in fact he had not been served with the bill

of complaint as "legal jabberwocky." Counsel for John Rogers has in his possession a copy of that answer admittedly signed by Joseph Urciolo. This is significant because had Urciolo not been properly served it is highly unlikely that he would have signed an answer. Joseph Urciolo some four and one-half years later (March 13, 1970) attached to his motion to revise the decree, an affidavit by Colosanto, to the effect that while acting as Deputy United States Marshal he had mistakenly served Raphael Urciolo instead of his brother, Joseph Urciolo in September, 1965.

On the basis of these facts we do not think the chancellor erred in his holding that:

> "It is elementary law that a proper official return of service is presumed to be true and accurate until the presumption is overcome by proof, and the mere denial of personal service by him who was summoned will not avail to defeat the sworn return of the official process server. *Weinrich v. Walker,* 236 Md. 290; *Harvey v. Slacum,* 181, 206. This member of the court finds it inconceivable that a practicing attorney would prepare an answer to a suit against him, sign it, certify to its being mailed, and mail it if he had not been personally served with the document giving rise to such answer."

Finally, with regard to Joseph Urciolo's contention that he had never been served with a copy of John Rogers' cross-bill, Rogers was granted leave by the chancellor (Feb. 13, 1970) to effect proper service upon him pursuant to Maryland Code (1969 Repl. Vol.) Art. 75, § 78, and this was accomplished.

*Decree affirmed, costs to be paid by Raphael G. Urciolo, Joseph J. Urciolo, Arthur J. McGinnis and Charles Dudley.*